MEL KENNEDY, ANTHONY LONGO, MARTIN DeVOURSNEY, JOSEPH SCERBO, EDWARD WIESE, BEN CHIVALK, WILLIAM E. REYNOLDS, SR., AND WALTER GEISLER, PLAINTIFFS-APPELLANTS, v. WESTINGHOUSE ELECTRIC CORP., A CORPORATION OF PENNSYLVANIA, DEFENDANT-RESPONDENT.

Argued September 27, 1954—Decided October 25, 1954.

282

*Mr. Morton Stavis* argued the cause for appellants (*Messrs. Gross & Blumberg,* attorneys).

*Mr. William L. Dill, Jr.,* argued the cause for respondent (*Messrs. Stryker, Tams & Horner,* attorneys).

The opinion of the court was delivered by

BRENNAN, J. Plaintiffs sue on behalf of themselves and upwards of 900 other hourly paid employees of defendant's Jersey City plant to recover holiday pay for Labor Day 1951 provided for by the terms of a collective bargaining agreement entered into by the defendant with United Electrical, Radio and Machine Workers of America (U.E.) covering employees of 21 of defendant's plants. Plaintiffs recovered judgment in the Superior Court, Law Division, after a trial without a jury, 25 *N. J. Super.* 601 (1953). The Appellate Division reversed, 29 *N. J. Super.* 68 (1953). We allowed certification on plaintiffs' petition, 15 *N. J.* 79 (1954).

Defendant refused to pay the holiday pay because of the concerted action of the hourly paid employees on each work day but two from July 12, 1951 to September 11, 1951 (Labor Day fell on September 3) in stopping work after only 3½ to 6 hours during their scheduled 8-hour shifts. The trial judge found, and plaintiffs do not challenge the finding, that the concerted action was promoted by the officers

of the local union and was taken "to put unwarranted pressure on the employer in the then pending negotiations" concerning a company proposal to revise the seniority clause of the collective bargaining agreement. The officers of the local union were told on Friday morning before the Labor Day holiday that payment for the holiday would not be made unless the employees worked complete shifts on Friday. Nonetheless, the employees stopped work in a body after 5½ hours of work.

The suit, brought by and on behalf of the employees against the employer, is based upon provisions of the collective bargaining agreement between the company and the union. However, the standing of the employees in their own right to maintain the action upon the agreement is not questioned. *Christiansen v. Local* 680 *of Milk Drivers, etc.,* 126 *N. J. Eq.* 508 (*Ch.* 1940).

Widespread recognition, while slow in coming, is now common that collective bargaining agreements give use to legal rights. See, for example National Labor Relations Act as amended by Taft-Hartley Act, 29 *U. S. C. A., sec.* 185; *Annotation,* 95 *A. L. R.* 10. The day is past when courts denied recognition to such agreements upon grounds that they merely established usages with very little, if any, legal consequences, or lacked consideration, or were unenforceable for want of mutuality of remedy, or reflected duress. 1 *Teller, Labor Disputes and Collective Bargaining,* secs. 158–162 (1940). The end of such concepts was forecast with the adoption and promotion of the public policy expressed in much federal and state legislation fostering and encouraging collective bargaining between labor unions and employers as the prime tool to achieve and maintain industrial peace and uninterrupted production to further essential social and economic objectives. See National Labor Relations Act, 49 *Stat.* 449 (1935), as amended by the Taft-Hartley Act, 61 *Stat.* 136 (1947), 29 *U. S. C. A., secs.* 151 *et seq., New Jersey Constitution of* 1947, *Art.* I, *par.* 19. The signing of a written contract embodying the terms agreed upon is regarded as the final and an essential step in the

bargaining process; and the agreement is viewed as itself an effective instrument of stabilizing labor relations and minimizing industrial strife during its term. *H. J. Heinz Co. v. National Labor Relations Board,* 311 *U. S.* 514, 61 *S. Ct.* 320, 85 *L. Ed.* 309 (1941).

But the collective bargaining agreement is in many respects a novelty in the courts raising problems not presented by ordinary contracts nor readily dealt with under traditional principles of contract law. Less than 30 years ago one commentator observed that "it is somewhat surprising to discover that their legal nature has never been carefully considered or precisely defined in an American court decision," *Fuchs, Collective Labor Agreements in American Law,* 10 *St. Louis L. Rev.* 1 (1925). Several courts which have since attempted an analysis have found it hard precisely to define the jural relation of the covered employees to the contracting parties and their rights and duties under the contract. The fact that the collective bargaining agreement establishes a structure of employment relations not just for particular known employees but for persons from time to time employed during the contract term and not always members of or desiring to be members of the contracting union, has led courts to say that the agreement resembles "a trade agreement * * * likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service," *J. I. Case Co. v. National Labor Relations Board,* 321 *U. S.* 332, 64 *S. Ct.* 576, 88 *L. Ed.* 762 (1944); that it is "in many ways a treaty," *Yazoo & M. V. R. Co. v. Webb,* 64 *F.* 2d 902 (5 *Cir.,* 1933); in our own books that "The relation between the collective bargain and the individual contract of employment somewhat resembles that between a group insurance policy and the individual insurance certificates issued under it," *Christiansen v. Local 680 of Milk Drivers, etc., supra,* 126 *N. J. Eq.* 512.

We have noted earlier that the employer here accepts the law to be that the plaintiffs have the right to sue their

employer directly upon the agreement. Do plaintiffs sue as the principals under a contract made for them by the union as their agent? Or are we to consider the union the principal and the employees third-party beneficiaries of the agreement? Both theories encounter difficulties. The agency theory poses the question how an employee may become party to the agreement if he is neither a member of the union nor wants to be or, if employed after the agreement is made, is not shown to have adopted it or to have contracted his hire with reference to it. And what is left to the union by way of direct rights of enforcement of provisions important to it as an organization, the union shop, for example? In the *Christiansen* case our former Court of Chancery adopted the agency theory and held that a union had no cause of action to sue for violation of a union security clause in the alleged wrongful discharge of four union members, but that only the employees could maintain an action to redress the alleged wrong. The third-party beneficiary theory would not have presented that obstacle to the union suit, and would also make immaterial in suits by employees the questions of the employee's choice of the union as his agent or adoption of the agreement. However, if the employees are to be considered third-party beneficiaries, can it always be said that the union and the company made the agreement primarily for the employees' benefit or are they not often merely incidental beneficiaries, particularly if it is not made to appear that they contracted their hire with reference to the agreement? *Teller, supra, pp.* 497 to 505. These and like questions emphasizing the difficulties experienced in applying ordinary contract concepts in solving problems arising under collective bargaining agreements have led some students to suggest that "we need a new legal category" to explain and govern such agreements. *Rice, Collective Labor Agreements in American Law,* 44 *Harv. L. Rev.* 572 (1931). Teller encourages that view. At *pages* 519–520 of his text, *supra,* he observes,

"That the market place should demand of the law a different and more effective way of dealing with newly arising problems is nothing novel to our law. The law merchant thus became part of the com-

mon law. It is as important as it is to maintain industrial peace that a like process be made the subject of conscious judicial treatment."

 The matter presented to us for decision in the instant case does not, however, call upon us to devise any special treatment in order to make our determination. The issue is the very narrow one of the interpretation of the collective bargaining agreement, and more particularly of the provisions governing holiday pay. We agree with plaintiffs that the canons of construction brought to bear on the ordinary contract are fully serviceable in ascertaining the meaning of the language employed in a collective bargaining agreement. It may be that the well known reluctance of negotiators of labor agreements to avail themselves of a lawyer's services in their drafting will often create more need for interpretation and aggravate its difficulties but the standards of construction will not differ for that reason. It is also true that these agreements increasingly provide for settlements of differences over interpretation and application by arbitration (this agreement does not so provide), but we do not understand, and neither side suggests, that we should take note of any new or different canons of construction evolved in the labor arbitration process of peculiar application to collective bargaining contracts. It is obvious that the important function of the collective bargaining agreement to further industrial tranquility justifies, indeed demands, that the agreement "be construed not narrowly and technically but broadly and so as to accomplish its evident aims," *Yazoo & M. V. R. Co. v. Webb, supra,* 31 *Am. Jur. Labor, sec.* 113; and that has been the decided tendency of the cases. *Teller, supra, p.* 505. However, as plaintiffs' brief urges, with that general precept in mind, the canons of construction applied to a commercial agreement in *Mantell v. International Plastic Harmonica Corp.,* 141 *N. J. Eq.* 379, 386–387 (*E. & A.* 1947), can and should govern us here:

"The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The design of the parties to a written contract is to be collected from the instrument as an en-

tirety. And the writing is to have a reasonable construction. Disproportionate emphasis upon a single provision does not serve the purpose of interpretation. Words, phrases and clauses are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intention. The literal sense of the terms may be qualified by the context. The significance of a particular part of the writing is determined by a consideration of all its parts. It is the revealed intention that is to be effectuated. In a word, the standard of interpretation is the meaning that would be attached to the integration by a reasonably intelligent person. And, in the quest for the common design, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain, are to be regarded." See also *Casriel v. King*, 2 *N. J.* 45, 50 (1949).

The provisions of the agreement important to the controversy are the following:

"Section VII—Strikes, Stoppages, and Lockouts

A. The Union and the Locals will not cause or officially sanction their members to cause or take part in any strike (including sit-downs, stay-ins, slow-downs, or any other stoppage of work) during the life of this Agreement. ☆ ☆ ☆"

"Section X—Hours of Work

The basic work week will be forty (40) hours based on eight (8) hours per day, five (5) days per week, Monday to Friday inclusive. An employee's work day is the twenty-four hour period beginning with his regularly assigned starting time on his workshift, and his day of rest starts at the same time on the day or days he is not scheduled to work. His work week starts with his regularly assigned work period on Monday. Variations in hours of and the schedules of hours of the several shifts are subjects for local negotiations."

"Section XII—Holidays and Vacations

1. Holidays

a. Holidays observed by the Companies will be New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas. Holidays falling on Sunday will be observed on Monday.

b. All hourly paid employees who have completed three (3) months' continuous service immediately preceding the holiday will be paid for their established shift hours on a holiday observed between Monday and Friday both inclusive. Hourly paid employees who were laid off for lack of work and are rehired within five (5) years after layoff, who had completed three (3) months' continuous service and had a total employment of at least one (1) year prior to their layoff, will also receive the above holiday pay.

c. Hourly paid employees will be paid for such hours at their average earned rate, as defined in Section XI, for the pay roll period involved.

d. The above payment will be made only to hourly paid employees who are on the active roll as of the day before the holiday within the week and who earn some wages during the week in which the holiday falls or any of the four preceding weeks.

e. Salaried employees will be paid for the seven holidays observed by the Companies falling within the work week, Monday to Friday, both inclusive."

The trial judge found as a fact, and again the plaintiffs do not contest his finding, that the conduct of the employees in curtailing their shift hours with the encouragement of the officers of the local union constituted a work stoppage in violation of the first quoted clause from section VII of the agreement. The company, however, has not chosen in this court to assert by reason thereof that it was or is entitled to terminate the agreement *in toto* and to be relieved of all obligation thereunder. There are evident practical reasons why the company should conclude that such a step is not an expedient course. The company bottoms its defense upon the narrow ground that by their conduct the employees and each of them put themselves in a position where they could not satisfy the condition precedent prescribed by section XII (b) to the payment of holiday pay, namely, that they be hourly paid employees "who have completed three (3) months *continuous service* immediately preceding the holiday" (Emphasis supplied).

The gist of plaintiffs' argument opposing the company's contention is that "continuous service" means and was intended by the parties to mean no more than that the employees should have been, as they were, on the company's "active" payroll during the three-month period, that is, have the "status" of employees continuously during that time. They insist that this is the meaning the words have acquired in labor relations parlance and point to their widespread use in that sense in clauses of collective bargaining agreements governing seniority, vacation pay and pensions. They cite arbitration awards so construing the words in connection with such clauses, concluding that the awards show a "consistent equating of 'service' to seniority accumulation, and 'continu-

ous' to the continuity of employment status." They argue that the agreement before us also points irresistibly to the use of the words in that sense inasmuch as paragraph (d) of section XII provides that to be entitled to holiday pay an employee who has the required three months' continuous service has only to be "on the active roll as of the day before the observed holiday within the week and earn some wages during the week in which such holiday falls or any of the four preceding weeks."

But plaintiffs' argument gives insufficient consideration to other pertinent provisions of section XII, particularly as they are interrelated with section X. Dealing with the two words "continuous service" separately, and first with the word "service," we cannot agree that it is to be taken as synonymous with employment "status." Section X prescribes a work week from Monday to Friday, and section XII provides for holiday pay only when the named holiday is observed on a day from Monday to Friday. The clear implication is that the holiday provision was intended to assure that the take-home pay of an employee regularly earning wages for labor performed should not be diminished when the holiday is observed on a day during his regular work week. The word "service" is thus illumined as contemplating the performance of labor in ordinary course during prescribed work schedules operative in the three-month period. Paragraph (d) of section XII does not oppose but buttresses this conclusion. That paragraph makes it clear that it is not enough that the employee be on the active roll; he must also have earned some wages for labor performed during the week in which the holiday falls or any of the four weeks preceding the holiday. Finally, but particularly persuasive that "service" contemplates "labor performed," under (b) and (c) of section XII holiday pay is at the employee's "average *earned* rate for the payroll period involved" ("straight time *earnings*" enhanced as provided by section XI) for his "established shift hours," prescribed as eight hours by section X, except as varied by local negotiations, which was not the case here. The conclusion is irresistible

that the parties were contracting for holiday pay for employees regularly performing labor, that is, rendering "continuous service" during the three-month period.

Plaintiffs urge that, notwithstanding the light as to the parties' meaning thus gained from the context of the agreement, we should conclude that "service" means "employment status" and not the performance of labor, because holiday pay was provided here as "additional wages for services" as part of a "wage package" in the nature of a disguised wage boost to keep down the amount of the straight wage increase entering into the basic wage rate. We are cited to the history of wage negotiations during and after the recent war when wage controls inhibited the amounts of increases in basic rates and the practice grew up of granting permissible "fringe" benefits, such as holiday pay, in lieu thereof. There are two answers to this argument. The first is that the record is absolutely barren of any evidence that the instant holiday pay provision came into this contract as part of a "wage package." The second is that if holiday pay was provided in lieu of a commensurate wage increase we should expect the holiday pay provision to call for the payment for a named holiday observed on Saturday or Sunday. The limitation to holidays observed during the basic work week is conclusive in the circumstances here shown that the provision was intended to allow the employees time off on the observed holidays without attendant reduction in weekly take-home pay.

Plaintiffs also endeavor to support their interpretation of "service" as "status" by reference to the second sentence of section XII (b) which provides for holiday pay to employees rehired within five years after a lay-off period prior to which they had completed three months of continuous service and at least one year's total employment with the company. We can find no relevancy whatever of that sentence to the question of the meaning of "service." It is clear to us that that sentence merely adds to the group of employees eligible to qualify for holiday pay such employees as have been rehired within the three months' period immediately preceding the

holiday, and thus not eligible to qualify under the first sentence, distinguishing them from other employees hired within the three months' period either for the first time or more than five years after a lay-off. We do not understand that the plaintiffs or those employees on whose behalf they sue include any employees within the necessarily small group covered by the second sentence.

We conclude, then, that "service" means labor performed in the context of the holiday pay clause, and turn to the question whether the refusal of the employees on the days mentioned to work more than $3\frac{1}{2}$ to 6 hours of their scheduled eight-hour shifts broke the continuity of the "continuous" service called for by the agreement. It does not appear from the record that any of the employees concerned with this suit were absent during the scheduled shift hours throughout the three months' period before Labor Day 1951 except during the hours on the days (all but two) when they refused to complete their shifts. In the sense that they put in some hours of labor on each work day of the period they did render continuous labor, and it is contended on their behalf that they thereby satisfied the requisite of performing "continuous service." Reliance is again put by plaintiffs upon paragraph (d) of section XII which, it is contended, obviously imports that even extended absences for weeks at a time do not interrupt continuity of service, this because employees are required thereunder to earn only "some wages" during the week in which the holiday falls or any of the four weeks preceding the holiday and be on the active roll as of the day before the observed holiday.

We may conclude that "continuous" service does not contemplate the performance of labor during every scheduled shift hour of every work day. In the very nature of things "there is really no such thing as continuous labor. Holidays, sicknesses, recreation periods, week-ends, all are breaks in the continuity of one's occupation, but would not necessarily destroy its continuity." *United States v. Perry*, 55 *F. 2d* 819 (8 *Cir.*, 1912). Paragraph (d) is to be read, we think, as implying no more than that breaks of service

for personal or other reasons which would appeal to reasonable men to be excusable in the particular circumstances shown will not destroy continuity of service. We are dealing here, however with a concerted and deliberate refusal of employees to complete their scheduled shifts—conduct encouraged by the local union officers. It opposes common sense to attribute to the parties' language a meaning to excuse willful stoppages violative of the solemn undertaking not to do such things. Indeed, the contrary is made clearly implicit in the provision computing holiday pay at the sum "paid for established shift hours." The "established shifts" are eight-hour shifts under section X except as the hours may be varied through "local negotiations." If shift hours are varied by agreement, holiday pay is accordingly paid for more or less than eight hours. But the employees in the instant case demand that this court render judgment awarding them an eight-hour payment despite their unilateral act in abridging their scheduled eight-hour shifts by 25% to 50% on all but two of the work days in the three-month period before the Labor Day holiday. Thus they seek to have by judgment what they would not be entitled to have under the contract if the curtailment of the shifts had been agreed upon in negotiations with the company. Giving the writing the meaning which would be attached to it by a "reasonably intelligent person," as plaintiffs insist, *Mantell v. International Plastic Harmonica Corp., supra,* their contention must be deemed to be without merit, for plainly it cannot reasonably be said that the parties contemplated that these employees could obtain by their willful violation of the contract what they could not ask if what they did had been done with the company's agreement. Such an interpretation is a complete negation of the primary purpose of the collective bargaining agreement; it fosters resort to stoppages instead of to negotiations to settle disputes. The only reasonable interpretation is that the unilateral adjustment of shift hours was not within the category of excusable interruptions of service in the sense contemplated by the agreement and therefore destroyed its continuity.

Finally, plaintiffs argue that the practical construction of the contract by the parties must be given effect and that on past occasions when stoppages occurred the employees were not refused holiday pay. It is true that in construing words of doubtful meaning contained in a collective bargaining agreement the past practices of the parties in like situations arising under the agreement will be accorded great weight. *Burton v. Oregon-Washington R. & Nav. Co.*, 148 *Ore.* 648, 38 *P. 2d* 72 (*Sup. Ct.* 1934). However, the evidence does not support plaintiffs' factual premise. There was proof that after some stoppages occurring within the three months' period before a holiday holiday pay was not refused. But in those situations the stoppage was terminated before the holiday. That was the case, for example, at this plant in connection with Thanksgiving Day, 1951. The stoppage which led to the dispute in suit did not end until September 11, about two weeks after the beginning of the three-month period ending with Thanksgiving Day. Holiday pay was paid, according to the testimony, consistent with a company policy in such cases not to borrow more trouble "after a situation is cleared up and the people are back at work." And the company officer in charge of this plant testified that under that policy holiday pay for Labor Day 1951 would also have been paid if the employees had not curtailed their shift hours on the Friday before when the union officers were told in the morning that it would not be paid unless full shifts were worked. But the refusal to pay in this instance was consistent with, not contrary to, the practice testified to as being followed when the conduct constituting the stoppages, as here, began before and continued through and after the holiday. On the two prior occasions when that occurred, neither at the Jersey City plant, the evidence was that the company did not pay.

Affirmed.

WACHENFELD, J. (dissenting). I am in accord with Judge Conlon that the plaintiffs have established their right to the holiday pay in question. I would award them judgment for

the reasons expressed in his opinion, 25 *N. J. Super.* 601 (*Super. Ct.* 1953).

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.