International Union of Electrical, Radio and
Machine Workers (CIO) v. Westinghouse
Electric Corp.

*Bernard Goldstone* and *H. M. Goldstein*, for plaintiffs.

*Fruit & Francis, John G. Wayman, Leonard L. Scheinholtz and Reed, Smith, Shaw & McClay,* for defendants.

McKAY, J., February 21, 1956.—This case is before the court in banc on preliminary objections to a complaint in equity.

The complaint avers that on October 1, 1950, the parties entered into a written agreement, referred to as the National Agreement, and attached to the complaint as exhibit "A", that on June 1, 1953, pursuant to the provisions of the National Agreement, Local 617, one of the plaintiffs and defendant, entered into a written agreement known as "Local Supplement", which is attached to the complaint as exhibit "B", that these agreements relate to compensation of employes represented by plaintiff at defendant's Sharon plant, that the National Agreement provides for the observance by defendant of seven holidays in each calendar year, including Labor Day, on which the employes represented by plaintiffs were to be paid for their established shift hours, that on or about August 21, 1954, the members of the local engaged in a strike, which lasted until October 2, 1954, and that, because of the strike, defendant has refused to give the employes on strike holiday pay for Labor Day (September 6), 1954.

The complaint asks that the court require defendant to specifically perform the said contracts. In particular, it asks that the court order defendant to pay the employes the holiday pay for Labor Day, 1954, that the court declare the rights of the parties under the holiday provisions of the contract, that defendant be required to render an accounting and that plaintiffs be awarded damages in the amount of $85,000.

The preliminary objections are three in number and consist of: (1) An objection that plaintiffs have an adequate remedy at law, (2) a demurrer and (3) a

challenge of plaintiffs' right to sue. We will consider the objections in the order of 3, 1 and 2.

1. Plaintiffs' right to bring the action.

Defendant contends that the present action, stripped of its trimmings, is nothing more or less than a suit to recover holiday pay for the employes represented by plaintiff unions. As such, it maintains, it is the employes that should bring the action. It contends that the employer has the duty to pay wages only because the individual employe performs his work, and quotes from the majority opinion in the case of Association of Westinghouse Salaried Employees v. Westinghouse Electric Corporation, 210 F. 2d 623 (1954). In that case the union sued the company in the Federal court under section 310 of the Taft-Hartley Act for payment of wages to some 4,000 employes who did not work on a certain day in April 1951. The union contended that defendant's failure to pay violated a collective bargaining agreement then in effect between it and the company, and sought a declaratory judgment, an accounting and a judgment in favor of the individual employes.

In holding that the court had no jurisdiction over the matter, the majority opinion stated, at page 630:

"In summary, we hold that the employer's duty to pay a certain rate arises out of the collective bargaining contract plus the sanctions of the labor relations Act. The duty to pay a particular employee wages in the sum resulting from such rate arises out of the individual contract of hire. The latter is the duty alleged here, and, therefore, Section 301(a) is not involved since there is no violation of a contract between an employer and a labor organization."

The authority of this opinion is destroyed, however, by the fact that, on appeal to the United States Supreme Court, the decision was affirmed upon different grounds in opinions some of which sharply refuted the reasoning of the Circuit Court.

On appeal to the Supreme Court, the judgment of the Circuit Court was affirmed by a six to two vote, the Supreme Court holding that section 301 did not confer jurisdiction on the Federal courts to entertain a suit for wages due to employes under a collective bargaining contract. The opinions written in support of the decision, however, differed in their reasoning. Chief Justice Warren and Justice Clark in one concurring opinion, and Justice Reed in a separate concurring opinion, held, as did the Court of Appeals for the Third Circuit, that the cause of action for wages allegedly due to an employe under a collective bargaining contract is properly one for the individual employe to assert and not his union.

On the other hand, Justice Frankfurter, writing for himself, and Justices Burton and Minton, attacked the reasoning of the Third Circuit and of the majority, stating, 348 U. S. 437, 457:

"It (the so-called eclectic theory of the Third Circuit) excludes from the court stage the party that is recognized in the required preliminary stages. The union that is empowered to negotiate and settle the controversy before suit is barred from bringing suit when settlement is not reached."

And on page 459:

"To hold that the union may sue, it is not necessary to hold that the employee may not sue in any forum, and vice versa. At least when the union and the employee are in agreement, there is no reason why either or both should not be permitted to sue."

While Justice Douglas and Justice Black dissented to the decision of the majority, their opinion on the question of the union's right to sue on behalf of its members supported that of Justice Frankfurter. In Justice Douglas's dissenting opinion he said, as to this point, page 467:

"In short, the union represents the interests of the community of employees in the collective bargaining

agreement. The wide range of its interests are envisaged by the Act, which gives the collective bargaining agency exclusive authority to bargain 'in respect to rates of pay, wages, hours of employment, or other conditions of employment.' 29 U. S. C. §159(a). The range of its authority is the range of its interests. What the union obtains in the collective agreement it should be entitled to enforce or defend in the forums which have been provided. When we disallow it that standing, we fail to keep the law abreast of the industrial developments of this age."

In our opinion, the reasoning of the five justices who support the union's right to sue in the courts for wages due its members is the sounder one. The principle underlying collective bargaining, which is now the established policy of our Commonwealth as well as of the nation, is that the bargaining agent shall represent the employes in the unit for which it is certified in bargaining, in negotiating and executing contracts relating to wages, hours of work and conditions of employment. It has the recognized right to settle disputes that arise under a contract. It follows that the union should also have the right to enforce the contract in the courts if that should become necessary. Unless, therefore, there is some obstacle in the statutes, decisions or procedural rules of our Commonwealth which prevents the application of this desirable result, we would hold that the union which is empowered to bargain for employes, and to adjust their disputes in conference or arbitration, is equally empowered to bring any action in their behalf which is necessary to enforce their contractual rights when other means have failed.

We have been referred to no such obstacles. On the contrary, what decisional authority exists appears to recognize a union's right to bring an action on behalf of those it represents.

In the case of Philco v. Unemployment Compensation Board of Review, 175 Pa. Superior Ct. 402 (1954), the Superior Court recognized that the union there involved had the right to invoke the arbitration provisions of a labor contract on behalf of the employes represented by it.

Similarly in the case of Povey v. Midvale Co., 175 Pa. Superior Ct. 395 (1954), the court refused an employe the right to sue for his wages because the arbitration provisions of the labor contract entered into by a union for the employes had not been complied with, thereby recognizing the right of the union to represent the employes in the arbitration proceedings.

In the case of Joint Board of Waist and Dressmakers' Union of Philadelphia v. Rosinsky, 173 Pa. Superior Ct. 303 (1953), a mandatory decree in equity was granted the union to compel employer defendant to arbitrate a dispute as required by a labor contract to which the union and employer were parties.

If a union has the standing to enforce an arbitration clause in a labor agreement, it follows that it has the right to bring an action on the contract to enforce any benefit provided in the contract.

The strongest support of the right of a union to sue on a labor contract on behalf of employes represented by it, however, is found in the Pennsylvania procedural rules.

Rule 2002(b) provides as follows:

"(b) A plaintiff may sue in his own name without joining as plaintiff or use-plaintiff any person beneficially interested when such plaintiff

"(1) is acting in a fiduciary or representative capacity, which capacity is disclosed in the caption and in the plaintiff's initial pleading; or

"(2) is a person with whom or in whose name a contract has been made for the benefit of another."

296

The scope of rule 2002(*b*) is discussed in Goodrich-Amram, section 2002(*b*) (1):

"This subdivision need not be considered an exception to the requirement that an action be brought by the real party in interest. Because of the definition of 'real party in interest,' its effect is to permit suit by the real party in interest alone without joining those who are beneficially interested. It merely provides that a plaintiff who brings an action, that is, a plaintiff who is entitled to bring an action, need not join those beneficially interested as co-plaintiffs or use-plaintiffs.

"For illustration, a contract is made with an agent as though he were acting for himself. The agent, as a matter of substantive law, would be entitled to sue the third person with whom he contracted. As the agent is the real party in interest to a claim upon the contract made in his own name, he would bring suit in his own name. As the agent was acting in a representative or fiduciary capacity in making the contract, Subdivision (b) would permit him to sue the other contracting party without joining or naming the principal as a party plaintiff."

Insofar as it may be held that plaintiffs are suing upon a contract made for the benefit of the employes, rule 2002(*b*) (2) establishes their capacity to sue without joining beneficiaries as coplaintiffs or use-plaintiffs. The authority for the foregoing proposition is to be found in Goodrich-Amram, section 2002(b)-3, which reads, inter alia, as follows:

"Subdivision (b) (2) of Rule 2002 permits a person with whom or in whose name a contract has been made for the benefit of another to sue upon such contract without joining the third party beneficiary as a plaintiff. The promisee of such a contract owns a cause of action against the promisor which is independent of the cause of action owned by the beneficiary. He is the party with whom the promisor contracted

and the recognition of the rights of the third party beneficiary does not destroy his right against the promisor with whom he contracted. As to this right the promisee alone is the real party in interest. He may therefore bring an action thereon in his own name and, by virtue of Subdivision (b) (2), he need not join the third party beneficiary as a co-plaintiff or use-plaintiff."

In our opinion, the above rule and comments thereon apply directly to the case at bar. Accordingly, we hold that plaintiffs have the right to bring an action to recover for the employes represented by them any wages or other benefits due to the employes under the contract between plaintiffs and defendant.

2. The adequacy of the remedy at law.

Defendant's third preliminary objection attacks the form of the present action, on the ground that plaintiffs have an adequate remedy at law and that, therefore, a court of equity does not have jurisdiction.

As to this contention, plaintiffs answer that what they seek is specific performance of a contract of which they are the promisees, and that equity alone can furnish this remedy. They cite the Arbechesky Unemployment Case, 174 Pa. Superior Ct. 217 (1953), which held that the union there involved had an equity action to compel specific performance of its agreement with the employer, whereby it could have compelled the employer to arbitrate a dispute.

This case is in line with other authorities to which we have referred which recognize the right of a union to obtain a decree of specific performance of a labor contract that will compel an employer to comply with an arbitration provision in a contract. This is entirely a different matter than specific performance of a contract to pay money due for holiday pay provided for in a labor contract. We have been referred to no authority recognizing the propriety of equity juris-

diction where the only question is one of payment of money due.

The present case amounts to nothing more or less than a claim for holiday pay due to employes represented by plaintiff unions. The recognized remedy for this type of claim is the action of assumpsit. It is not only adequate but, in our opinion, it is exclusive.

Plaintiffs attempt to bring the action within the jurisdiction of equity by asking for an accounting. But, as defendant points out, an accounting may not be decreed unless the accounts between the parties are mutual: Holland v. Hallahan, 211 Pa. 223 (1905); Paton v. Clark, 156 Pa. 49 (1893). It is only when the account is complicated and the examination of defendant's entire business is required that equity will take jurisdiction in an accounting where the figures are all on one side: Custis v. Serrill, 303 Pa. 267 (1931); Ebbert v. Plymouth Oil Co., 348 Pa. 129 (1944).

Further, if plaintiffs do not know how much is due the employes whom they represent, the Rules of Civil Procedure relating to discovery are available for that purpose.

We hold, therefore, that plaintiffs' remedy at law in assumpsit is adequate and that equity has no jurisdiction.

Accordingly, the case must be certified to the law side of the court, as required by rule 1509 (c) Pa. R. C. P., unless the demurrer is to be sustained. In view of the filing of the demurrer, however, it is necessary first to determine whether the complaint sets forth a good cause of action.

3. The sufficiency of the cause of action.

This leads us to the question whether, if the case is certified to the law side of the court, plaintiffs, under the facts pleaded in the complaint, may recover holiday pay for Labor Day, 1954, for the employes they

represent, in view of the fact that, on that day, the employes were on strike.

Defendant's principal position on this point is that, under the pleading and the attached contracts, no recovery may be had because the employes, being on strike for 16 days prior to the holiday, were not in "continuous service" within the meaning of the clause of the contract which qualifies the persons entitled to receive holiday pay.

As noted above, section XI, 1, d, of the National Agreement reads:

"All hourly paid employees who have completed three (3) months' continuous service immediately preceding the observed holiday will be paid for their established shift hours on such holiday."

Defendant takes the position that the phrase "continuous service" as used in the above clause means "labor continuously performed." Accordingly, it contends that the employes in the present case, having been voluntarily away from their employment for the 16 days immediately preceding the holiday in question, due to the strike, were not engaged in "continuous service" for the three months period leading up to the holiday, and hence do not qualify for holiday pay.

In support of this interpretation of the term "continuous service", it cites the case of Kennedy v. Westinghouse Electric Corporation, 16 N. J. 280, 108 A. 2d 409 (1954), which held that "service" meant "labor performed" within the meaning of a comparable holiday pay clause in the contract construed in that case.

In the Kennedy case, the employes reported daily for work for a period prior to the holiday, but did not work the full shift, and instead, left the job each day after a few hours of work. The court interpreted this conduct on their part as breaking the continuity of the "continuous service" qualification for holiday pay and denied them the right to receive such pay.

The court stated, page 416:

"The only reasonable interpretation is that the unilateral adjustment of shift hours was not within the category of excusable interruptions of service in the sense contemplated by the agreement and therefore destroyed its continuity.

Plaintiffs attempt to distinguish the Kennedy case from the present one by pointing out that the conduct of the employes in the former case amounted to a violation of their contract, whereas in the present case, the strike is admittedly consistent with the contract.

In our opinion this distinction is not sufficient to prevent the Kennedy case from being direct authority in support of defendant's position. If by continuous service is meant uninterrupted labor performed, it would seem that the partial cessation of work each day in the Kennedy case did not break the continuity of service to as great a degree as the complete stoppage for 16 days in the case at bar.

Defendant also cites the case of Stobnicki v. Westinghouse Electric Corporation, decided June 3, 1954, by the Supreme Court of Erie County, New York, an appeal from which was dismissed by the Appellate Division for the Fourth Judicial District, without opinion, on January 5, 1955, 285 App. Div. 853. (These cases were not reported at the time of the argument, but certified copies of the orders and opinion accompanying the Supreme Court order were furnished to the court.)

In the Stobnicki case, plaintiff employes sued to recover holiday pay for July 4, 1951, although they had been on strike from June 25, 1951, until July 6, 1951. The labor contract upon which they relied, after naming July 4 as a holiday to be observed, provided that "all hourly paid employes who have completed three (3) months' continuous service immediately preceding the holiday will be paid for their established

shift hours observed between Monday and Friday both inclusive."

The court stated the question to be whether or not the strike or work stoppage operated to break the continuity of the required three months' service and thereby disentitled plaintiffs to the holiday pay. Citing the Kennedy case, supra, which at that time had been decided by the Appellate Division of the Superior Court of New Jersey (101 A. 2d 592), the court stated that it would follow the Kennedy case and entered judgment dismissing the complaint.

There can be no question that both the Kennedy and the Stobnicki cases support defendant's position that a strike interrupts the period of "continuous service" required in a labor contract as a qualification for being entitled to receive holiday pay. If we follow these authorities we must hold here, as did the courts in those cases, that the phrase "continuous service" means "labor continuously performed" and that a strike interrupts the continuity of that service.

In our present opinion, however, it is not clear whether the words "continuous service" in the contract here involved mean labor continuously performed or whether they refer to a period of continuous status as an employe.

As is well known in labor relations, many privileges such as seniority rights, right to vacation pay and the like are not customarily accorded to very recent employes. A probationary period, often of three months duration, is usually required before an employe is entitled to enjoy these rights. For example, in the National Agreement in this case, it is provided that where a decrease of force is necessary, "accumulated length of *service* will govern with respect to lay-offs necessary to decrease forces" (sec. XII, F, 2), and in cases of rehiring or layoffs due to increasing or decreasing

forces, "accumulated length of *service*" governs: Sec. XIIG.

According to the Local Supplement, Exhibit "B", the probationary period for a new employe at the Sharon plant is three months (par. A), and when temporary furloughs are necessary, all hourly employes in the group concerned having "less than three (3) months of *service*" are to be furloughed for a period not to exceed two weeks: Sec. XII D. Likewise employes having "more than three (3) months of *service*", if furloughing is necessary, have their furlough time equalized for a two week period: Id. (Italics supplied.)

This language suggests that in the present contracts the word "service" may mean what it generally means in the labor law field, viz., the period of time during which the employe has been in the employment of the particular employer. Such terms as "length of service" and "accumulated service" are significant ones in the determination of rights of seniority as between employes. If it is used in this sense, "continuous service" in the holiday clause of the contract would have to be interpreted as "uninterrupted status as an employe", which, of course, would continue notwithstanding the strike.

In our opinion, the phrase "continuous service" is sufficiently ambiguous to lend itself to further explanation by competent extrinsic evidence, if that is available. At any rate, its ultimate construction should await a trial of the case.

There remains for consideration the broad contention of defendant that it could not have been the intention of the parties to give holiday pay to employes who were on strike, because employes on strike do not receive or expect to receive any compensation. The theory is that compensation is pay for services rendered even though it represents pay for leisure time,

and that the parties would be unlikely to agree to pay *additional* compensation for days not worked during a period when ordinary compensation was not being paid because the employes were on strike and no work was being done. There would seem to be merit in this position.

When the entire contract is considered, it is obvious that the parties made an agreement relating to wages, hours and working conditions of employes who were working and intending to work at defendant's plant. While employes are fully entitled to engage in a strike, so long as it does not violate their contract (and this strike does not), it would not be expected that striking employes would receive compensation of any sort during a period when no services were being rendered due to the strike.

With respect to the holiday pay provisions of the contract, the contract provides that seven named holidays shall be observed. This means that employes who would otherwise work on those days shall not work because of the observance of those holidays. The agreement then provides that they are to be paid the amount which they would be receiving but for the observance of the holiday. On Labor Day, 1954, however, they would have received nothing (but for the observance of the holiday) because they were on strike during that period. Why then would they expect to be paid for that day?

Let us suppose that the strike were to continue for two years. During this period no wages would be paid or expected. Would it be seriously contended that the parties intended to provide in this contract that, notwithstanding no compensation was to be paid for these two years, the employes would nevertheless receive pay for each of the 14 holidays occurring during the biennium as *additional* compensation? In fact, would it not, rather, be true that because of the prolonged

strike, holidays were not being "observed" at all because, regardless of holidays, the work at the plant had entirely ceased so far as these employes were concerned?

Further, the contract provides in section XI, 1, e, that in computing the amount of pay due for any particular observed holiday, the rate of pay shall be the employe's "average earned rate for the payroll period involved." At the Sharon Westinghouse plant payroll periods are weekly. Therefore the "payroll period involved" is the week in which the holidays occurs. Obviously, the parties contemplated in their agreement that, at least in general, the employes who were to receive holiday pay would be working the week the holiday occurred so that there would be an average earned rate of pay for that week upon which the rate of holiday pay could be based. How could there be an average earned rate for that week when there was nothing earned whatever by any of these employes due to the strike?

It is true, as plaintiffs point out, that section XI, 1, f, which as a condition of eligibility provides that all employes must have earned some wages during any one of the four weeks preceding the holiday, is inconsistent with section XI, 1, e. But the latter section cannot be explained away by holding that the two sections, taken together, indicate that a four week payroll period is to be the basis for holiday pay. There is no such payroll period at the plant. The only payroll period is a weekly one. We think that section XI, i, f, imposes an additional holiday pay qualification for employes in active employment, and that section XI, 1, e, establishes the rate for holiday pay in the average case. As such, the latter indicates that the parties did not contemplate the payment of holiday pay to persons who were on strike during the weekly pay period in which the holiday falls.

Plaintiffs point out that the contract also provides for vacation pay and urge that vacation pay is essentially the same as holiday pay. They contend that vacation pay is payable to striking employes, citing Textile Workers Union v. Paris Fabric Mills, 22 N. J. Superior Ct. 381 (1952), and conclude that, therefore, holiday pay is payable.

There is an essential difference between vacation pay and holiday pay, particularly when the strike occurs late in an employment year, for in a sense vacation pay has been actually earned by the employe prior to the strike. The difference is recognized in the case of McDowell v. Far West Garments, Inc., 41 Wash. 2d 412, 249 P. 2d 372. In that case the court held that the payment of vacation pay to striking employes would not amount to a waiver of the right to refuse to pay them holiday pay. We question whether the matter of vacation pay is sufficiently similar to the question of holiday pay to furnish satisfactory precedent for the latter. In addition, the argument assumes that vacation pay is necessarily payable to striking employes, which, in itself, is at least open to question.

Therefore, upon consideration of the complaint and the exhibits, it is clear that it was the intention of the parties that holiday pay is to be payable, as other wages are payable, only when the employes are working, and that it is not payable when they are voluntarily idle due to a strike. Accordingly, the demurrer filed by defendant should be sustained.

### Amended Order

Now, March 5, 1956, it is ordered that the preliminary objections be disposed of as follows:

(1) Preliminary objections III, 1, 2, 3 and 4, raising the defense of lack of capacity to sue, are overruled.

(2) Preliminary objections I, 1, 2, 3 and 4, raising the objection of adequacy of remedy at law, are sustained. No order is made to certify the case to the law side of the court due to our disposition of preliminary objections II.

(3) Preliminary objections II, 1 and 2, constituting a demurrer, are sustained. The complaint in equity is dismissed, and it is ordered that judgment be entered for defendant.

### Exception

Now, March 5, 1956, to the above order of court counsel for plaintiffs except and, eo die, a bill of exceptions is sealed for plaintiffs.

### Exception

Now, March 5, 1956, to the above order of court counsel for defendant except and, eo die, a bill of exceptions is sealed for defendant.