**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CONE MILLS CORPORATION, Respondent.**

No. 10585.

United States Court of Appeals Fourth Circuit.

Argued Nov. 1, 1966.

Decided Feb. 6, 1967.

Gary Green, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Wayne S. Bishop, Atty., N. L. R. B., on brief), for petitioner.

Thornton H. Brooks, Greensboro, N. C. (McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on brief) for respondent.

Before BOREMAN, BELL and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

The Company and the Union[1] have negotiated and executed successive collective bargaining contracts at the Minneola plant since November 1955. The most recent contract, renewed in 1961, included a seniority provision that all layoffs and recalls would be determined on the basis of departmental seniority, provided only that an employee exercising his seniority right must be adequately qualified to fill the position sought. The contract also provided that five shop stewards, as designated by the Union, would be given *super*seniority for the purpose of layoffs and recalls.

In the fall of 1962 the Union notified the Company that it wished to terminate the existing contract upon its expiration date, and the contract thereby expired on November 10, 1962. Since then, the parties have engaged in efforts to negotiate the terms of a new collective bargaining agreement, and it is not suggested that their efforts have been other than in good faith.[2]

During January 1964, more than a year after contract termination by the Union, the Company, for economic reasons, laid off several weaver trainees. Estelle Dunn was laid off on January 3, 1964. Another weaver trainee was laid off a "few days"[3] later. Layoffs were in order of normal juniority in disregard of the *super*seniority status of shop steward Estelle Dunn under the terminated contract. The filing of her grievance resulted, and the question of her right to superseniority is now presented to this court.

From the standpoint of Estelle Dunn, who has lost a "few days" employment, if the Company's conduct is adjudged unlawful, this case will be another "one of the least consequential unfair labor practices in the Act's history."[4] Although the outcome is of trivial monetary significance, the larger question presented is said to be of considerable importance. As framed by Board counsel, it is: "Whether the Board properly found that the company violated Section 8(a) (5) and (1) of the Act by unilaterally terminating superseniority rights for shop stewards while engaged in negotiations with a certified bargaining representative."[5]

---

1. Textile Workers Union of America, AFL-CIO.

2. Indeed, the parties have successfully re-negotiated contracts at two other plants of the employer since the fall of 1962. At least one of these newly-negotiated contracts contains a superseniority clause similar to that contained in the contract with which we are concerned.

3. The quotation is from the Trial Examiner's decision. The record is no more explicit.

4. NLRB v. Aluminum Tubular Corp., 299 F.2d 595, 597 (2d Cir. 1962). Perhaps the Regional Director thought so. He initially refused to issue a complaint, but was thereafter directed to do so by the General Counsel of the Board.

5. Company counsel's version is equally valid: "Where a union voluntarily terminates in November 1962 a collective bargaining contract which contains a negotiated provision that accords superseniority to five members of the General Shop Committee,

## I.

It is axiomatic in contract law that parties to an agreement are relieved of their mutual obligations upon termination of the agreement. Restatement, Contracts § 386 (1932). A collective bargaining agreement is not, of course, an ordinary contract. See, e. g., J. I. Case Co. v. NLRB, 321 U.S. 332, 334, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Kennedy v. Westinghouse Electric Corp., 16 N.J. 280, 108 A.2d 409, 47 A.L.R.2d 1025 (1954); see generally Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1 (1958). Since parties to a collective bargaining agreement normally contemplate a subsisting contractual relationship of indefinite duration with not infrequent renewals or renegotiations, and since the employment relationship generally continues beyond expiration or termination of the agreement, it has been said that some rights created by collective bargaining agreements survive the termination of the agreement. 61 Colum.L.Rev. 1363, 1364 (1961). It is necessary, however, to carefully define what is meant by "survive."

We think it conceptually correct to say that an employer is always free after termination of the contract to unilaterally change conditions previously established by the contract. In this sense there is no "survival." In *American Ship Building*, in enumerating the powers of employers that exist in counterbalance of the employee's power to strike, the Court said: "Similarly, the employer can institute unilaterally the working conditions which he desires once his contract with the union has expired." American Ship Building Co. v. NLRB, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855, 866 (1965).

But the more important question is not whether the employer is free to abolish a contractually derived right after contract termination. Clearly he may do so. The question is *how* and *when* he may do so, i. e., whether he must give reasonable opportunity to bargain before he acts. The obligation, to the extent there is one, to give notice and opportunity to bargain derives not from the contract but from the National Labor Relations Act. That there may be such an obligation is what is meant by "survival." For this reason, it is not helpful to analysis to speak of superseniority rights having become "vested."[6] If "vested," it should be added that such rights are subject to being "divested" by the employer after affording reasonable opportunity to bargain. To a less extent, the use of the term "survive" can be misleading. Rights that survive contract termination do not live forever and can be destroyed after affording the opportunity to bargain.

Not all rights created by a collective bargaining agreement "survive" termination. Some union security provisions, e. g., union shop and check-off, do not. An employer may unilaterally discontinue them *without* affording the union opportunity to bargain. See Industrial Union of Marine and Shipbuilding Workers v. NLRB, 320 F.2d 615 (3rd Cir. 1963).

Estelle Dunn's superseniority is closely related to union security. The primary purpose of superseniority is to help the union further establish itself by policing the contract and rewarding union leadership. Even so, it cannot be said that it is not a condition of Estelle Dunn's employment. Not without difficulty, we conclude that this type of superseniority, is one of those rights which "survive" contract termination, i. e., the

---

and where no contract has been agreed upon by January 1964 to replace such terminated contract, and where the subject of superseniority is not under discussion between the parties, does the employer's refusal to accord superseniority to shop committeemen constitute a violation of §

8(a) (5) of the National Labor Relations Act?"

6. The Hearing Examiner below used the term in discussing the Board decision reviewed in Industrial Union of Marine and Shipbuilding Workers v. NLRB, 320 F.2d 615 (3rd Cir. 1963).

employer may abolish superseniority—but only after affording the union an opportunity to bargain. See Industrial Union of Marine and Shipbuilding Workers v. NLRB, supra.

## II.

It is urged by the employer that whether a contract right "survives" depends upon whether it was under negotiation at the time of unilateral action. On January 3, 1964, when the Company laid off Estelle Dunn, superseniority was not under negotiation with the Union.[7]

█ It was said by the Supreme Court in *Katz* "that an employer's unilateral change in conditions of employment *under negotiation* is * * * a violation of § 8(a) (5)." NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). (Emphasis added.) We do not think the Court meant to imply that an employer is always free to make unilateral changes with respect to conditions of employment that are *not* "under negotiation" without affording the union opportunity to bargain with respect to such changes. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). It seems to us that the predominant factor is not whether the subject was "under negotiation," nor even whether general negotiations are then being conducted, but whether in the light of all of the circumstances there existed reasonable opportunity for the Union to have bargained on the question before unilateral action was taken by the employer. Notice is important only as it bears upon whether there actually was such opportunity. Common law conceptions of notice, including formality and specificity, are no more helpful in this area than are traditional contract notions.

## III.

Section 8(a) (5) of the National Labor Relations Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * *." 29 U.S.C.A. § 158(a) (5). The statute itself imposes a duty to bargain "in good faith." 29 U.S.C.A. § 158(d). Recently "the story is one of decisions transforming the simple requirements of union recognition and bona fide negotiation into doctrines through which the NLRB * * * [has] come to condemn * * * conduct which sharply departs from good bargaining practice." Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1403 (1958).

In this case, the Labor Board has condemned unilateral action by the Company as a per se[8] violation of the Act. It is well to remember that the per se doctrine originated as simply a rule of evidence, arising out of a felt necessity to relieve the Board of the sometimes heavy burden of proving want of good faith. Such a prima facie rule of evidence has unquestionably been approved by the Supreme Court in *Katz*. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). But we do not read that decision as an adoption of the per se doctrine. The Court held that the Board "may" hold such unilateral action to be an unfair labor practice in violation of Section 8(a) (5), but it did not hold that the Board must in every instance do so, and it recognized that such unilateral action may, although rarely, be justified by reasons of substance. We do not think *Katz* leaves us free to disregard the "record as a whole" in reviewing the question of whether or not unilateral action amounts to a refusal to bargain. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Court specifically did not "foreclose the possibility that there might be circumstances which the Board could or should accept as excusing or justifying unilateral action * * *." NLRB v. Katz, supra, 369 U.S. at 748, 82 S.Ct. at 1114, 8 L.Ed.2d at 238–39.

7. The parties were engaged in general contract negotiation but had not specifically discussed superseniority.

8. Board counsel said in oral argument, "This is what we call a 'per se' case."

■ Thus, we think it is incorrect to say that unilateral action is an unfair labor practice per se. See Cox, The Duty to Bargain in Good Faith, 71 Harv. L.Rev. 1401, 1423 (1958). We think it more accurate to say that unilateral action may be sufficient, standing alone, to support a finding of refusal to bargain, but that it does not compel such a finding in disregard of the record as a whole. Usually unilateral action is an unfair labor practice—but not always.[9]

## IV.

We turn now to an application of these principles to the case before us.

Although the Company was free contractually at all times after November 10, 1962, to change its policy with respect to superseniority, we think that it acted unilaterally in prima facie violation of the Labor Act (not the contract) on the date of revision of the company policy manual. Neither the Trial Examiner nor the Board determined when that occurred. It may well have been prior to six months before February 26, 1965, when the complaint was issued in the present case, so that prosecution would be barred under Section 10(b) of the Act.[10]

But the complaint was neither instituted nor prosecuted on the theory that unilateral revision of the company policy manual constituted a refusal to bargain; the Board's position was, instead, that the layoff of Estelle Dunn was a per se violation of the Act.

If the Board's order is to be enforced, it must be on the theory of the complaint: that the layoff of Estelle Dunn was an unfair labor practice. Even so, the Company's unilateral action in revising the company policy manual—if known to the Union—may have constituted sufficient "notice" to afford bargaining opportunity prior to the layoff.

There is no evidence indicating that the Company's manual revision was kept secret. It is not even shown that the employees and the Union were without knowledge of it. The Examiner was content with the negative finding that "there is no evidence in the record that the Union was ever *notified* of this revision." (Emphasis added.) But "notice" is of no importance if in fact the Union knew of the abolition of superseniority and had opportunity to bargain about it prior to implementation of the change of policy by laying off Estelle Dunn.

■ Assuming that the laying off of Mrs. Dunn was itself prima facie an unfair labor practice, the record as a whole neutralizes the presumption. The very reason that unilateral action is prima facie unlawful is in the high degree of probability that it may frustrate bargaining opportunity. When the record as a whole suggests that there was such opportunity, the presumption and the reason for it vanish. At the very least,

9. The Board itself has recognized that an employer may lawfully act unilaterally with respect to a mandatory subject of bargaining. See e. g., Westinghouse Electric Co., 61 L.R.R.M. 1165, enforced, 369 F.2d 891 (4th Cir. 1966).

10. Section 10(b) provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." 29 U.S.C.A. § 160(b).

The Trial Examiner accepted the testimony of Company Vice President Cone.

His testimony may or may not mean that the Company revised its policy manual and abolished superseniority soon after contract termination in November 1962.

"Q. Now after the contract expired or was terminated by the Union in November, 1962 at Mineola, [sic] was there thereafter issued to that plant a policy manual?

"A. Yes, I believe that there was a policy manual prior to that time, and a new one was developed, revised, and issued after that date.

"Q. Does that policy manual have any provision in it for top seniority or super seniority [sic] for shop stewards?

"A. No, sir."

the burden is on Board's counsel to show that the Union was not aware of the abolition of superseniority by revision of the company manual.

 The burden of affirmatively establishing an unfair labor practice by the employer rested upon the General Counsel, and the burden of proof never shifts to the employer.[11] Lozano Enterprises v. NLRB, 357 F.2d 500 (9th Cir. 1966); Cedar Rapids Block Co. v. NLRB, 332 F.2d 880, 885 (8th Cir. 1964); NLRB v. Winter Garden Citrus Prod. Coop., 260 F.2d 913, 916 (5th Cir. 1958).

Aside from the question of policy manual revision amounting to notice and opportunity to bargain, and even if we accept the Board's contention that the unilateral change of conditions of employment occurred with the layoff of Estelle Dunn, we would still be unable to enforce the Board's order.

Estelle Dunn was laid off on January 3, 1964. General Counsel's Exhibit 2A entitled "Stipulation," relied upon by the Trial Examiner, contains the agreement: "In December 1963 and in January 1964, and at the present time, the Respondent refused, and continues to refuse, to treat the members of the General Shop Committee as heading the seniority roster for the purposes of layoffs and recalls."

 The stipulation is imprecise. It does not disclose *when* in December the Company refused to recognize superseniority. If early in December, the Union may have known of the Company's intention for as long as thirty days before layoff. On the facts of this case, even a shorter period would meet the requirement that there be reasonable opportunity to bargain prior to the laying off of Estelle Dunn. Unilateral change of a condition of employment is not unlawful if the Union has had an opportunity to bargain. It is not shown that there was not such opportunity.

We think the layoff of Estelle Dunn was merely implementation of the earlier unilateral revision of the company manual and was not even prima facie a violation of the Act. A layoff is normally unilateral. The timing of the layoff supports our analysis. No occasion arose until January 1964 (or December 1963) for the Company to implement its new policy in disregard of the terminated contract. The first job displacement (December 1963) was caused by automation. Until the Company was faced with the situation requiring layoffs, it had no occasion to act under its nonsuperseniority policy. This is not a case of a company knowing full well of its intention to change a policy waiting deliberately until a strategic time in negotiations to announce it for the purpose of undercutting the Union. Nor is it a case of the Union and the employee being lulled into a false sense of security by a course of conduct which is suddenly changed.

It is indicative of the attitude of the parties, which is not irrelevant even in an unfair labor practice case based on unilateral action, that at the first grievance hearing the Company representative plainly did not even understand the nature of the grievance and erroneously thought that the Union was interested in getting Estelle Dunn back on the payroll in a "permanent" position. The Company representative was willing to explore her qualifications and "see what we could work out." Even at the second hearing it was suggested that Company and Union "not be technical about this thing, but let's discuss the merits of the case and see if we couldn't get Mrs. Dunn back to work." General Counsel for the Union rejected this suggestion (made by a Union committeewoman) and insisted that the grievance be processed only on the basis of contract superseniority.

11. Because the employer considered that the Trial Examiner in his decision had mistakenly relieved General Counsel of the burden of proof, it filed with the Board on November 3, 1965, a conditional motion to reopen the record and receive further evidence on such issues as the precise date when the employer terminated superseniority, knowledge by the Union of such termination, and lack of negotiations between the parties on superseniority during the period involved. The Board denied this motion.

With the additional background of intensive good faith bargaining on both sides in other plants of the same company resulting in collective bargaining agreements, at least one of which contains a superseniority clause, we are unable to conclude on any theory that the layoff of Estelle Dunn in disregard of her prior superseniority status violated the 8(a) (5) [12] duty to bargain.

 We conclude that the Board's decision is not supported by substantial evidence viewing the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Enforcement denied.

J. SPENCER BELL, Circuit Judge (dissenting):

I dissent. The point upon which the majority decides the case was never before the Examiner as an issue in the case and it should not be considered at this late date. The Board refused to reopen the case and so should we. In any event the most that we should do would be to remand the case and order the Board to take evidence on the point.

12. The Labor Board found in the present proceeding both 8(a) (1) and (5) violations. An 8(a) (5) violation does not necessarily encompass an (8) (a) (1) violation. See NLRB v. Katz, 369 U.S. 736, at 742 n. 9, 82 S.Ct. 1107 n. 9, 8 L. Ed.2d at 235 n. 9. However, since the 8 (a) (1) violation in the present proceeding was entirely derivative from the finding of an 8(a) (5) violation, there is no need to consider it separately.