Tuscan Dairy Farms, a defendant against which is exhibited the supplemental counter-claim of its co-defendant Local 680 of the Milk Drivers and Dairy Employes, moves to strike the counter-claim on the ground that it does not state a cause of action. The motion is, in substance, a demurrer and, like a demurrer, admits every allegation of the counter-claim which is well pleaded. Board of Commissioners, c., of Vineland v.Maretti, 93 N.J. Eq. 513; Kuskin v. Guttman, 98 N.J. Eq. 617;99 N.J. Eq. 887; Baum v. Canter, 104 N.J. Eq. 224; New OrderBuilding and Loan Association v. Landau, 9 N.J. Mis. R. 939;156 Atl. Rep. 276.
The pleading in question is named a supplemental counter-claim because it shows certain matters which have arisen since a former counter-claim was filed. However, it repeats all the statements of the original counter-claim and is obviously intended by the pleader to stand alone, in place of the first counter-claim. A counter-claim must itself set forth the facts relied upon as ground for relief, and not depend on the original bill or other pleadings. I do not mean that it is improper for the counter-claim to refer to and expressly adopt specific parts of the bill. This is permissible to avoid unnecessary repetition. But the counter-claim cannot be *Page 510 
otherwise aided by the bill. 21 C.J. 507. Of course, the bill must be inspected to see whether the counter-claim is germane.
The case made by the counter-claim follows:
On July 21st, 1939, the Dairy Company and the Union entered into a contract, the terms of which I will quote at length:
"1. This agreement shall cover every employe of the Company as defined hereafter.
"2. The Company agrees to employ or keep in its employ only members of the Union in good standing; provided that persons now employed by the Company who are not now members in good standing of the Union shall be given Five (5) Days to make application for membership in the Union, and the Union agrees to accept them as new members without discrimination, provided further that in the event of a vacancy, such vacancy shall be filled by an individual who shall be competent and who shall meet the employment requirements of the Company, and in filling such vacancy first consideration shall be given an individual, if available, who is a member of the Union. Should any employe be suspended or expelled from the Union because of an infraction of Union rules, the Company agrees to discharge such employe within Seven (7) Days after receiving notice in person from properly authorized Union official as to such infraction and expulsion or suspension.
"3. The Company agrees that it will deduct, upon proper authorization by the employes on the second pay day of each month from the wages of its employes a sum equal to such employes' monthly dues and assessments to the Union and remit same to the Union at such time.
"4. It is further agreed that the parties hereto hereby expressly make themselves parties to the Collective Bargaining Negotiations now taking place before Mr. Arthur S. Meyers, who is now conducting such negotiations on behalf of the Mayor of the City of New York, between Local Unions of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, affiliated with the American Federation of Labor and Metropolitan Milk Bargaining Agency, for it for the purpose of said negotiations. Said agreement to apply to the employes as specifically classified in this Contract.
"The parties hereto hereby expressly agree to be bound by any Agreement resulting from aforesaid negotiations and also agree to be bound by all of the terms and conditions of any Contract resulting therefrom, provided however that with respect to the parties hereto, the provisions of such contract will take effect retroactively as of the date hereof with respect to the employes classified in this contract. Until such time as such contract shall become effective, all terms and conditions of employment now in effect shall continue, but no employe shall be discharged or laid-off, nor shall any terms or conditions of employment of any employe be changed or altered." *Page 511 
Notwithstanding the contractual provisions, the Dairy Company failed and refused to make itself a party to the New York negotiations. Those negotiations, however, culminated on November 4th, 1939, when the Milk Dealers Committee on behalf of the "milk dealers" and committees for Locals 338, 584 and 680 approved the terms of an agreement "with the express understanding that each committee will sponsor and recommend its ratification and acceptance." The draft contract so approved is made part of the counter-claim and is in form a voluminous agreement to be executed by a single employer on the one part and a local union on the other.
Meanwhile — that is, before the conclusion of the New York negotiations — Tuscan notified counter-claimant that it rescinded the agreement of July 21st, 1939, on the ground it had been obtained by fraud. The union denies any fraud.
The counter-claim is filed to enforce the contract with Tuscan and, as part thereof, the New York contract. The National Labor Relations act was discussed on the argument of the motion, but Tuscan does not appear to come within the scope of that statute.
A collective bargaining agreement between a labor union and an employer presents an interesting legal problem. The solution which was prevalent twenty years ago is stated in Commons andAndrews, Principles of Labor Legislation (1920 Ed.) 118.
"The so-called `contract' which a trade union makes with an employer or employers' association is merely a `gentlemen's agreement,' a mutual understanding, not enforceable against anybody. It is an understanding that, when the real labor contract is made between the individual employer and the individual employe, it shall be made according to the terms previously agreed upon. But there is no legal penalty if the individual contract is made differently. To enforce the collective contract would be to deny the individual's liberty to make his own contract." According to this view, the real contract which the law regards is that between the employer and the individual workman. The only effect given the collective bargain is a presumption, in the absence of proof to the contrary, that its terms have been *Page 512 
adopted as part of the individual contract. Hudson v.Cincinnati Railway (Ky.), 154 S.W. Rep. 47; 45 L.R.A.
(N.S.) 184.
Gradually, however, courts have come to the position that the collective bargaining agreement gives rise to valid, enforceable contractual obligations. The relation between the collective bargain and the individual contract of employment somewhat resembles that between a group insurance policy and the individual insurance certificates issued under it. The contract between employer and union not only enters into the individual contract, but it circumscribes the rights of the employer and the members of the union with respect to making individual contracts of employment. It creates legal rights and duties which are independent of particular hirings. The development of the law on the subject is treated in 95 A.L.R. 10.
A collective bargaining agreement is the joint and several contract of the members of the union, made by the officers of the union as their agents. It is enforceable by or against individual members of the union in matters which affect them peculiarly; and it is enforceable by or against the union in matters which affect all the members alike, or large classes of members, for instance, those who are employes of the other party to the contract.
In our reports are several cases by or against unions based on contracts of the kind under discussion. In Gilchrist Co. v.Metal Polishers, c., Union, 113 Atl. Rep. 320, the union was enjoined from ordering a strike in violation of the contract.Master Weavers' Institute v. Associated Silk Workers, c.,116 N.J. Eq. 502, is a similar case, although the injunction was denied. Upholsterers, c., Union v. Essex Reed and Fibre Co.,12 N.J. Mis. R. 637; 174 Atl. Rep. 207, and Hudson Bus, c.,Association v. Hill Bus Co., 121 N.J. Eq. 582, are cases in which the union came into chancery to enforce the contract by injunction.
The contract which counter-claimant sues to enforce provides for a closed shop and fails to set forth any circumstances to justify the insertion of this provision of the contract. Tuscan argues from this that the contract is contrary to *Page 513 
public policy and void and quotes from Lehigh Structural SteelCo. v. Atlantic Smelting and Refining Works, 92 N.J. Eq. 131
(at p. 143), where Vice-Chancellor Backes commented, "WhiteMountain Freezer Co. v. Murphy, supra (101 Atl. Rep. 357), clearly indicates the point of cleavage that prima facie a strike for a closed shop is unlawful, but may be justified by showing that it was inaugurated to advance the material interests of the unions." But the vice-chancellor was not speaking of a closed shop in a single factory. The Lehigh Case dealt with a contract covering nearly all the building contractors of New York City, while the White Mountain Case was brought by four manufacturers of machinery in the little city of Nashua, New Hampshire, to enjoin a strike for a closed shop. A contract between a single employer and a labor union providing for exclusive employment of its members is not in itself unlawful.Four Plating Co. v. Mako, 122 N.J. Eq. 298. Whoever attacks such a contract must show that it unreasonably restrains trade or tends to create a monopoly. Only when it appears that the contract by itself, or in conjunction with other similar contracts, or understandings, or customs, imposes a closed shop in substantially an entire industry throughout a considerable area, does the contract become prima facie void and the burden arises of justifying it by showing special circumstances. Whether it is susceptible of justification at all is a question on which I express no opinion.
There is a hint in the Tuscan contract itself that it is part of a large scheme — namely, the reference to the New York negotiations, but this is not enough to show monopoly. The counter-claim is not defective in that it pleads a void contract. I turn now to the specific charges of breach of contract and the prayers for relief.
The counter-claim shows that Tuscan, without just cause, discharged four named members of the Union from its employ in violation of the contract and the counter-claim prays that Tuscan be required to reinstate them with back pay. None of them is a party to the counter-claim. While their unjustifiable discharge may give them a cause of action on the contract, it is a cause solely between them and Tuscan and not *Page 514 
between the members of the Union collectively and Tuscan. No relief in this respect can be had on the counter-claim.
In the contract, the company agrees "upon proper authorization by the employes" to deduct a sum equal to their Union dues and to remit the same to the Union. The counter-claim charges that Tuscan has refused to remit dues to it and it prays that it be required to comply with this provision of the contract. The counter-claim, however, does not show that any of the employes have authorized Tuscan to deduct dues from their wages, and therefore no breach of the contract in respect to the remission of dues appears.
The draft contract negotiated in New York contains a detailed schedule of wages. The counter-claim shows that Tuscan has refused to pay this wage scale but had paid much lower wages, and prays relief in this respect. So the question arises whether Tuscan is bound by the New York contract. The parties expressly agreed "to be bound by any agreement resulting from aforesaid negotiations and also agree to be bound by all the terms and conditions of any contract resulting therefrom." Evidently they intended to be bound to the same extent as the other parties to the negotiations which were being conducted before a conciliator acting on behalf of the mayor of New York. The negotiations produced a form of agreement which the several committees promised to recommend for ratification and acceptance. The counter-claim fails to show that the agreement so negotiated has been accepted by any of the unions or employers, or ever became effective, or that it binds anyone. Therefore, it does not bind Tuscan and Tuscan is not required to pay the wages mentioned in the New York draft agreement.
Lastly, the counter-claim prays in general terms that the court adjudge that the agreement of July 21st, 1939, is valid and binding upon Tuscan as well as the Union, and that Tuscan be decreed specifically to perform the same. These prayers are based upon Tuscan's attempted rescission of the agreement on the ground of fraud. But Tuscan, in spite of its repudiation of the contract, does not appear to have failed to observe any of its terms. The pinch will likely come when actual contracts result from the New York negotiations. *Page 515 
The anticipatory breach is not enough to move the court to decree specific performance.
The prayer for a decree establishing the contracts is in effect a prayer for a declaratory judgment such as is authorized by the uniform statute. R.S. 2:26-66 et seq. Generally, the question whether the parties are bound by an alleged contract is purely legal and must be submitted to a court of law and not to chancery. Springdale Corp. v. Fidelity Union Trust Co.,121 N.J. Law 536; Moresh v. O'Regan, 122 N.J. Eq. 388; Union TrustCo. v. Goerke, 103 N.J. Eq. 159; 105 N.J. Eq. 190. But the counter-claim shows that Tuscan repudiates the contract because of alleged fraud, and thus is presented a problem within the familiar jurisdiction of chancery. The issue whether Tuscan is bound by this contract is raised by the bill of complaint and answers and will doubtless be adjudicated if the bill is pressed to a decree. But I think that the Union is entitled to seek an affirmative decree establishing the contract, regardless of the prosecution of the bill and without awaiting a breach of the contract by Tuscan.
The motion to strike the counter-claim will be denied.