LILLARD *v.* EMPLOYMENT SECURITY COMMISSION.

1. UNEMPLOYMENT COMPENSATION — EMPLOYMENT SECURITY ACT —
COLLECTIVE BARGAINING AGREEMENT — DISCIPLINE.
It is not the purpose of the employment security act to have that
act used as a disciplinary measure to enforce a private col-
lective bargaining agreement (CLS 1956, § 421.29).

2. SAME—CREDITS—BENEFICIARIES.
Credits toward unemployment compensation which have been ac-
cumulated while the employee was working are designed to run
not only to the benefit of the claimants but, also, to the benefit
of any wives and children they may have and to the benefit
of the public generally.

3. SAME—LABOR DISPUTES—DISQUALIFICATION FOR BENEFITS.
It is not the role of the employment security commission or the
courts to judge the merits of a labor dispute in determining
whether or not a claimant for unemployment compensation
benefits is disqualified (CLS 1956, § 421.29).

4. SAME—LABOR DISPUTE—MISCONDUCT CONNECTED WITH WORK—
DISQUALIFICATION FOR BENEFITS.
Plaintiff employee who participated in labor dispute and was dis-
charged by the employer pursuant to collective bargaining
agreement with union was subject to disqualification for ben-
efits for period of unemployment due to the labor dispute but
not permanently barred from benefits for misconduct connected
with his work (CLS 1956, § 421.29).

CARR and KELLY, JJ., dissenting.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 48 Am Jur, Social Security, Unemployment Insurance, and Retire-
ment Funds § 10.
[2] 48 Am Jur, Social Security, Unemployment Insurance, and Retire-
ment Funds § 34 *et seq.*
[3, 4] 48 Am Jur, Social Security, Unemployment Insurance, and
Retirement Funds § 36.
Construction and application of provisions of unemployment com-
pensation or social security acts regarding disqualification for
benefits because of labor disputes or strikes.   28 ALR2d 287.

Appeal from Wayne; Gilmore (Horace W.), J. Submitted April 6, 1961. (Docket No. 21, Calendar No. 48,804.)   Decided September 23, 1961.

Certiorari by Freddie Lillard against the Michigan Employment Security Commission, its Appeal Board, and Chrysler Corporation to review denial of claim for unemployment compensation following discharge. Judgment for plaintiff. Defendant Chrysler Corporation appeals.   Affirmed.

*Rothe, Marston, Mazey, Sachs & O'Connell (William Mazey, of counsel), for plaintiff.*

*Albert W. Rolf, Foster, Foster, Campbell & Lindemer, and Benjamin O. Schwendener, Jr. (Edmund E. Shepherd, of counsel), for defendant Chrysler Corporation.*

CARR, J. (*dissenting*).   Prior to August 15, 1957, plaintiff was an employee of the defendant Chrysler Corporation at its Lynch Road plant. He was classified as an arc welder and was a member of group 3, department 70.   Prior thereto the employer's supervisory staff had planned the making of an improvement in the method of operation of group 2 in said department, the proposed change involving the combining of a gauging and welding operation.   The plan contemplated that if the change worked out in a satisfactory manner a turntable would be installed at a later date, the effect of the alteration being to eliminate 1 employee from each line.   Said plan contemplated the making of the change on the first shift at 7 a.m. on August 12, 1957.   It does not appear, however, that any reduction in man power took place at that time, such result following the installation of the turntable some 3 or 4 weeks later.

The contemplated change did not affect group 3 of department 70 in which plaintiff was employed. Plaintiff's period of employment on August 12, 1957, began at 3:30 p.m.   Approximately 4 hours later, during or shortly after the lunch period, some of the employees in group 2 of department 70 started to walk off the job.   The witnesses on this phase of the case were not in accord as to the number that remained working.   Plaintiff followed employees from group 2 who were leaving their job, his time-card indicating that he left at 7:52 p.m.   He was not directed, or authorized, by any supervisor or by any representative of the union to which he belonged to leave his work.   However, he did so.

On Tuesday, August 13th, the occurrences of the preceding day were in substance repeated.   Plaintiff's timecard indicated that he left at 5:08 p.m. Those employees who did not walk out proceeded in normal manner and worked full time.   On both dates, after some of the employees left, pickets began to appear at the plant gates.   On the 13th plaintiff was directed by his foreman to continue working, but did not do so, although it is unquestioned that he might have continued in the usual manner.   At about 10:30 in the evening plaintiff was observed in the picket line at the plant.   On Wednesday, August 14th, he did not report for work at all.   On that day he was observed in the picket line before 1 of the plant gates engaged in stopping trucks seeking to enter.   Due apparently to a combination of circumstances, including the picketing and some shortage of stock with which to operate, the work in the plant ceased between 2:30 and 3:30 p.m. on August 14th.

It is undisputed that the actions of plaintiff and other employees were taken without authorization or direction from officials of the AFL-CIO, the collective bargaining representative for the employees, and were clearly designed and intended to hamper

the production of the employer. Representatives of the latter contacted officials of the union, and as a result operations were resumed on a normal scale, or practically so, on August 15th. On that day plaintiff, and apparently some others, were discharged because of their actions in participating in the so-called wildcat strike. Plaintiff then filed application for unemployment compensation under the provisions of the Michigan employment security act.*

Among other grounds of disqualification for benefits expressly declared by said statute is that an employee "has been discharged for misconduct connected with his work." Section 29(1)(a)(2) (CLS 1956, § 421.29 [Stat Ann 1960 Rev § 17.531]). Following a somewhat extended discussion of the testimony in the case, with particular reference to the claims of the plaintiff, the defendant appeal board came to the conclusion that plaintiff's conduct was such as to constitute misconduct within the meaning of the clause quoted, and an order was accordingly entered denying unemployment benefits. On appeal the circuit court of Wayne county reversed and the case is now before us for review, having been appealed by the employer in accordance with the provisions of section 38 of the act (CLS 1956, § 421.38 [Stat Ann 1960 Rev § 17.540]).

At the time of the occurrences above mentioned there was in force and effect a collective bargaining agreement between the Chrysler Corporation and the UAW-CIO representing its employee members. Sections 5 and 7 of said agreement are pertinent to the present controversy, and read as follows:

*"(5) Strike prohibited.*
"The union will not cause or permit its members to cause, nor will any member of the union take part

---

* PA 1936 (Ex Sess), No 1. as amended (CL 1948 and CLS 1956, § 421.1 et seq., as amended [Stat Ann 1960 Rev § 17.501 et seq.]).

in, any sit-down, stay-in or slowdown 'in any plant of the corporation, or any curtailment of work or restriction of production or interference with production of the corporation. The union will not cause or permit its members to cause nor will any member of the union take part in any strike or stoppage of any of the corporation's operations or picket any of the corporation's plants or premises until all the grievance procedure as outlined in this agreement has been exhausted, and in no case upon a matter on which the appeal board* has power to rule, and in no other case until the negotiations have continued for at least 5 days after the director of labor relations has given his decision, and not even then unless sanctioned by the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America."

*"(7) Right to discipline.*

"The corporation reserves the right to discipline any employee taking part in any violation of section (5) of this agreement."

The said agreement covered in detail matters relating to the employment relation betweeen defendant corporation and its employees. It was not a contract for employment between the appellant and its employees. Obviously, the collective bargaining agreement contemplated the making of individual contracts of hiring which in general operation should be subject to the terms, agreements, and restrictions set forth in the bargaining agreement made on behalf of all employees by their representative, the union, with the employer.

The supreme court of the United States in *J. I. Case Co.* v. *National Labor Relations Board,* 321 US 332 (64 S Ct 576, 88 L ed 762), gave analytical consideration to the nature of the collective bargaining agreement, saying in part (pp 334–336): '

---

* *I. e.* appeal board for grievances, with corporation and union members.—REPORTER.

"Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily · comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. Without pushing the analogy too far, the agreement may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service, which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. Indeed, in some European countries, contrary to American practice, the terms of a collectively negotiated trade agreement are submitted to a government department and if approved become a governmental regulation ruling employment in the unit.

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure."

As pointed out in the court's opinion, the employee is entitled to the benefit of the collective bargaining agreement in his relations with his employer. Such being the case the conclusion must necessarily follow that the employer is likewise entitled to the protection of said agreement. The purpose of such an undertaking, as the courts have recognized, is the protection of the parties thereto, the employees, and the public generally which is, of course, vitally interested in the prevention of economic disturbances. Because of such situation we find in the agreement here involved the provisions above quoted, obviously designed to prevent hasty, ill-considered and unauthorized interruptions of employment and production.

In the instant case it is not open to question under the testimony of the witnesses examined before the referee that plaintiff acted in total disregard of the restrictions imposed on his conduct by the collective bargaining agreement. His conduct in leaving his work, especially when directed by his foreman not to do so, his engaging in picketing at the plant gates, and, in general, his apparent desire to encourage like actions on the part of other employees, not only ignored his obligations to his employer but also indicated a desire on his part to interfere with the operations of the plant in which he was employed. As before indicated, and as the appeal board in substance found, plaintiff had no personal interest in the contemplated change affecting group 2 of department 70. No reason is apparent why he should have been unwilling that the procedure outlined in the collective bargaining agreement should be followed in accordance with its obvious purpose.

In *Streeter* v. *Industrial Commission,* 269 Wis 412 (69 NW2d 583), the supreme court of Wisconsin had before it a case analogous on its facts to the instant controversy. A collective bargaining agreement.

entered into between an employer and a union representing the employees, provided for settling grievances by arbitration as the final step in the grievance procedure, the contract reciting that:

. "In view of the orderly procedure outlined in this agreement, the union will not authorize or sanction any strike, stoppage, slowdown or restriction of output and the company will not lock out the employees."

Notwithstanding the contract a union meeting was called for 2 p.m. on February 28, 1952. Four employees were discharged for participating in the walkout. Benefits were denied by the industrial commission on the ground that each had been "discharged for misconduct connected with his employment" within the meaning of the pertinent provision of the Wisconsin statute. In affirming such holding the supreme court of that State held (p 416):

"The commission has found that the conduct of each of the 4 plaintiff employees in either instigating or participating in the work stoppage and walkout, or both, constituted 'misconduct' within the meaning of such statute. There is ample credible evidence, including the provisions of sections 1 and 5 of article 12 of the collective bargaining contract, to sustain such finding. Section 3 of article 12 of the contract authorized the employer to discharge the employees guilty of such breach of the contract, and the employer exercised such right."

The supreme court of New Jersey in *Bogue Electric Co.* v. *Board of Review, Division of Employment Security, Department of Labor and Industry,* 21 NJ 431 (122 A2d 615), reached a similar conclusion under the provisions of the statute of that State relating to unemployment compensation benefits. There the employer, Bogue Electric Company, discharged an employee and as a result a number of other employees left their work. In consequence

the timecards of employees so leaving were removed from the racks and they were discharged.   There the collective bargaining agreement between the employer and the union representing the employees contained a provision against strikes, cessation of work, sit-downs, lockouts, et cetera, and, in general, action constituting an interference with the normal conduct of the employer's business.   The board of review took the position that what had occurred amounted to a labor dispute, and that there was no difference in the status of a strike sanctioned by the union and one not so sanctioned.   On appeal the appellate division held that the employees were guilty of misconduct within the meaning of the term as used in the New Jersey statute and subject to the disqualifications thereby imposed with reference to benefits. The supreme court of the State affirmed.   In the opinion written by Justice Oliphant and concurred in by other members of the court, including Chief Justice Vanderbilt and Justices Heher, Wachenfeld, Jacobs, and Brennan, there being no dissent, it was said in part (pp 435, 436) :

"The motive that led to the enactment of the statute and declared policy therein is the key to the understanding of the statute, and the public policy upon which it is based is to achieve social security by affording protection against a hazard in our economic life by relieving economic insecurity due to involuntary unemployment.   *Glover* v. *Simmons Co.* (1955), 17 NJ 313 (111 A2d 404).   We find nothing in the statute that indicates that employees are entitled to finance a labor dispute under the unemployment compensation act.   See *Campbell Soup Co.* v. *Board of Review, Division of Employment Security* (1953), 13 NJ 431, 436 (100 A2d 287), where we stated, 'The statute is designed to serve the general public interest and not alone the interest of the unemployed.'

"While we agree with the board of review that the meaning of the term 'misconduct' in the statute is not to be determined by what is set forth in a private collective bargaining agreement, nevertheless a collective bargaining agreement is the joint and several contract of the members of the union made by the officers of the union as their agents. It is enforceable by and against individual members of the union in matters which affect them peculiarly; and it is enforceable by or against the union in matters which affect all the members alike or large classes of members, particularly those who are employees of the other party to the contract. *Christiansen* v. *Local 680 of Milk Drivers* (1940), 126 NJ Eq 508, 512 (10 A2d 168); *cf. Kennedy* v. *Westinghouse Electric Corp.* (1954), 16 NJ 280 (108 A2d 409, 47 ALR2d 1025). It establishes certain norms or standards by which the rights and duties of the employer and employees are evaluated and it is to be construed with regard to the situation of the parties, the attendant circumstances and the objects they were striving to attain. *Kennedy* v. *Westinghouse Electric Corp., supra.*

"The contract here laid down a standard of behavior with respect to the cessation of work which was breached when these particular employees stopped work in protest against the discharge of the shop steward. There was a breach of the terms of the contract warranting their immediate suspension by the union and the immediate discharge of such employees by the company on such cessation of work. It seems to us that a voluntary and unauthorized cessation of work by employees of the scale indicated here is a sufficiently serious threat to an employer to be adjudged misconduct in the sense that such term is used in the statute, NJSA 43:21–5(b)."

In *Yellow Cab Company of Philadelphia* v. *Unemployment Compensation Board of Review*,* 170

* Also reported as *Muldoon Unemployment Case.*—REPORTER.

Pa Super 625 (90 A2d 599), there was a contract between the employer and a labor union representing the employees which contained a provision against strikes, slowdowns, lock outs, and refusals to work on the part of such employees. Procedure was outlined for the orderly determination of questions relating to disciplinary measures or to conditions of employment. It appeared that the employees seeking unemployment compensation had acted with others in an attempt to bring about a work stoppage, and had induced other employees to strike. It was held that such employees were guilty of unlawful misconduct constituting a breach of duty to the employer, and compensation was denied under the Pennsylvania statute. This decision was cited with approval by the supreme court of Massachusetts in *Howard Brothers Manfg. Co.* v. *Director of the Division of Employment Security,* 333 Mass 244 (130 NE2d 108). Of like import is *Weimer Unemployment Compensation Case,* 176 Pa Super 348 (107 A2d 607).

Under the above cited decisions and others of like nature the fact that an employee has disregarded duties resting on him in connection with his employment, as imposed by the collective bargaining agreement, may constitute misconduct in relation to such employment. In determining the status of the agreement between the bargaining agent and the employer we are not dealing with an ordinary contract of hire between an employee and the person, natural or artificial, to whom he agrees to render service. The collective agreement, in other words, is in a category peculiar to itself. In the instant case the proofs taken before the referee, and the finding of facts of the appeal board based thereon, indicate that plaintiff disregarded his obligations to the public, to the union that represented him, to his employer, and to fellow employees. The natural

result of what he did was detrimental to the interests of all. His acts were connected with his employment and naturally were directly concerned with the operations of the defendant corporation.

As before noted, the appeal board considered carefully the proofs before it in reaching a conclusion that plaintiff was guilty of misconduct connected with his work. On 2 successive days he deliberately walked off the job disregarding the request or direction of his foreman that he remain. The fact that fellow employees did continue to work is significant. His testimony indicated that when he first left his place of employment on August 12, 1957, he did not know what the controversy affecting group 2, department 70, was about. If he learned later, he knew that it did not concern him. However, he persisted in his course, leaving work again on the following day and not reporting at all on August 14th. His picketing activities indicated his attitude and purpose. The fact that resort was had to the procedure outlined by the collective bargaining agreement as soon as the officials of the union took charge of the situation is significant as indicating the improper nature of the conduct of plaintiff and others immediately preceding such action.

Under section 38 of the employment security act, above cited, the determination of the appeal board as to the facts was not subject to reversal by the circuit court unless contrary to the great weight of the evidence. *Nobes* v. *Unemployment Compensation Commission*, 313 Mich 472; *Kalamazoo Tank & Silo Company* v. *Unemployment Compensation Commission*, 324 Mich 101. In the instant case on the basis of the record before the appeal board it may not fairly be said that its finding that, as a matter of fact, plaintiff was guilty of misconduct connected with his work was repugnant to the great weight of the proofs. On the contrary, it was fully

supported by the evidence. It was not subject to reversal.

At the time plaintiff was discharged from his employment on August 15, 1957, the employer had resumed operations on a normal scale or practically so. There is no claim that he lost any wages prior to that time. His application for unemployment benefits was filed after his discharge and, hence, must necessarily have been based on unemployment resulting therefrom. In consequence the sole question at issue is whether plaintiff was disqualified from unemployment benefits due to misconduct on his part connected with his work. Obviously the acts of which his employer complained affected his work, as well as the work of other employees, and the operations of the employer. As before emphasized, the findings of fact of the appeal board were in accordance with the evidence on the hearing before the referee and the action of the circuit court in setting aside the order of the appeal board should be reversed, and the case remanded for affirmance of said order. No other disposition of the case can be justified under the provisions of the controlling statute.

As declared by the legislature therein, the basic purpose of said act was to relieve against economic insecurity resulting from unemployment. To that end a fund was created "for the benefit of persons unemployed through no fault of their own."* The statute was enacted in the interest of the general welfare of the people of the State, and it should be so construed. The purpose in creating the fund in question was not the protection of employees deliberately violating the obligation resting on them under the basic contract between their union and their employer, and by affirmative action flouting the au-

---

* CL 1948, § 421.2 (Stat Ann 1960 Rev § 17.502).

thority of the union and endeavoring to injure the employer in the operation of its business. In the instant case the plaintiff must be presumed to have intended the logical consequences of his acts, and among such consequences must be the denial of benefits payable from the reserve fund to which employers are required to contribute. Otherwise employers lose the benefits to which they are entitled under the collective bargaining agreement and, in effect, are required to contribute to those who have sought to interrupt and interfere with the continuance of their business operations.

KELLY, J., concurred with CARR, J.

EDWARDS, J. We have threshed this straw, recently, repeatedly, and vigorously. See *Cassar* v. *Employment Security Commission,* 343 Mich 380, overruled in *Linski* v. *Employment Security Commission,* 358 Mich 239.

The present case is indistinguishable in principle from the *Linski Case* where this Court applied the specific labor disputes disqualification for an unauthorized strike rather than the general misconduct disqualification. Both *Linski* and this case involve a discharge for a work stoppage where each side claimed the other had violated contract provisions.

The Michigan employment security commission referee who heard the testimony found the facts as follows:

"The referee finds as facts that claimant started with employer at its Highland Park plant on August 30, 1943. He started at the Lynch Road plant on October 28, 1945, and was discharged August 15, 1957, for infraction of company rules, specifically, the rule against an unauthorized walkout. Claimant was an arc welder, group 3, department 70, working on repairs. On Monday, August 12, 1957, employer

instituted a change in operations, combining a welding and manufacturing operation, which would eliminate 1 man on each line each shift.   The workers on the second shift, group 2, walked out at 7:33 p.m., August 12, 1957, right after the beginning of the lunch period.   All but 2 or 3 left.   Claimant and his group were eating lunch, and after group 2 left claimant later walked out, punching out his card at 7:52 p.m.   On Tuesday, August 13, 1957, the first shift in department 70 worked and the second shift started, but between 5 and 6 p.m. walked out again. Claimant again followed them out.   On Wednesday, August 14, 1957, department 70 did not come in to work, and in department 71 about 50% appeared at work, and some of these walked out.   The union held a meeting that morning.   Shortly after noon, Wednesday, employer shut down the whole plant. There was a small picket line at the east and at the west gates Monday night, Tuesday night and Wednesday morning.   Claimant appeared in the picket line Tuesday night and Wednesday afternoon. On Thursday, August 15, 1957, everything was normal and full scale operations were resumed, and the whole matter was submitted to grievance.   No grievance was filed by the men before they walked out, but employer talked to the union officers Monday night and Tuesday, and a grievance was filed either August 14, 1957, or August 15, 1957.   Approximately 50 workers were disciplined for an unauthorized walkout.   A majority, some 30 or so, were given a disciplinary penalty of 2 days off work.   A smaller number, some 10 or more, were given 2 weeks off, 2 were given 1 month off, and claimant and 3 other workers were discharged.   In assessing penalties to the men, employer reviewed their complete records, and the penalty of discharge was given claimant because he had walked out on 2 occasions and had been in the picket line on 2 occasions.   His past record was not bad, there having been 1 reprimand and warning March 4, 1954, because of poor attendance, and 1 reprimand November 5, 1956, when claimant

got into an altercation with a fellow worker at the clock. It was not established that claimant exercised any leadership in the walkout.

"Employer pointed to 2 sections in the contract between the corporation and the union, as the final reason for claimant's discharge.

"Section 5 of the contract provides:

" 'The union will not cause or permit its members to cause, nor will any member of the union take part in, any sit-down, stay-in or slowdown in any plant of the corporation, or any curtailment of work or restriction of production or interference with production of the corporation. The union will not cause or permit its members to cause nor will any member of the union take part in any strike or stoppage of any of the corporation's operations or picket any of the corporation's plants or premises until all the grievance procedure as outlined in this agreement has been exhausted, and in no case upon a matter on which the appeal board* has power to rule, and in no other case until the negotiations have continued for at least 5 days after the director of labor relations has given his decision, and not even then unless sanctioned by the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America.'

"Section 7 provides:

" 'The corporation reserves the right to discipline any employee taking part in any violation of section 5 of this agreement.'

"Under rates of production, sections 46 and 47 provide:

" 'Sec. 46: The management agrees that in establishing rates of production it will make studies on the basis of fairness and equity consistent with quality of workmanship, efficiency of operations and the reasonable working capacities of normal operators. Allowances will be made for personal time and for such elements as standard tool changes,

---

* I. e. appeal board for grievances, with corporation and union members.—Reporter.

material handling, and fatigue, where these are a factor.

" 'Sec. 47: When the management decides to study a job it will give advance notice to the employee who works on the job and to the chief steward that the study is to be made and shall notify them of the standard on the job after the study has been completed.'

"The parties did not agree on the interpretation of these 2 sections last above cited, employer contending that it has the right to change an operation, such as it did herein, without any notice to the union, claimant and his representatives contending that this unilateral action by the company was in itself a violation of the contract, that employer should have advised the union of this contemplated change in production methods before putting it into effect.   *   *   *

"In this case, the fact that claimant was working in group 3 of department 70, and the employees who first walked out worked in group 2, is not determinative of the issue.   Claimant was a fellow worker in the same department.   Workers in claimant's department were engaged in a labor dispute, and claimant, who walked out with others, was engaged in a labor dispute, a controversy between the workers in his department and the employer over a change in operations in the department."

His decision was:

"Claimant is disqualified for week ending August 17, 1957, under the terms of section 29(1)(b) of the act (labor disputes section).*

"Claimant is not disqualified under the terms of section 29(1)(a)(2) of the act (misconduct section)."*

Subsequent thereto, relying on the then existing ruling of this Court in *Cassar, supra,* the appeal

---

* CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).

board modified this decision so as to apply the misconduct disqualification.

The appeal board's decision was entered on September 24, 1959. *Linski, supra,* was decided by this Court November 25, 1959, and was, of course, followed by the Wayne circuit judge who heard this appeal below and who modified the appeal board's decision so as to apply the labor disputes provision.

This appeal represents still another attempt to make use of a public act, the Michigan employment security act, as a disciplinary measure to enforce a private collective bargaining agreement. See *Cassar, supra,* and *Linski, supra.*

No such purpose is spelled out in the Michigan employment security act. Further, this collective bargaining agreement provided for its own penalties which included disciplinary layoffs or discharge. Claimant was discharged. His discharge was the subject of a grievance under the collective bargaining contract. It was not rescinded. It is not involved in this appeal. The full measure of discipline provided by the collective bargaining agreement has been applied to this claimant. As far as the private collective bargaining agreement is concerned, claimant has lost his job and his case.

What is at issue here are the credits toward unemployment compensation which he accumulated while working. These benefits are designed to run not only to the benefit of claimants but, also, to the benefit of any wives and children they may have and to the benefit of the public generally. Rights to these benefits are spelled out by public law and must be judged by public tribunals.

Claimant contends that his disqualification for benefits should be under the labor disputes provision and thus limited to the duration of the work stoppage while the company contends the disqualification should be for misconduct and hence permanent.

The argument for permanent disqualification is pressed with much moral indignation at the lack of consideration for the employer's interest on the part of this employee, and with no examination at all of his contentions in relation to the labor dispute. It might be suggested that his actions arose more out of his concern for his own and his fellow workers' interests in their jobs than out of any antagonism toward his employer.

The claimant was a member of a department where, as a result of a newly automated process, jobs were being eliminated. In the Detroit industrial area, with its mass unemployment in recent years, such a measure is bound to be of concern at least to every worker in the department affected. It is claimant's position that job elimination and new job standards were promulgated by the employer without advance notice to, or consultation with, the union representing the employees. He claims that such advance notice and consultation were required by the collective bargaining agreement and that the company's failure to follow the contract in this regard was itself a violation of the collective bargaining agreement.

If we were to judge claimant's conduct as it relates to the collective bargaining agreement surely we would be required likewise to judge the company's conduct in relation to the same instrument.

But actually we all pay lip service to the notion that it is not the role of the Michigan employment security commission or the courts to judge the merits of a labor dispute. *Lawrence Baking Co.* v. *Unemployment Compensation Commission,* 308 Mich 198 (154 ALR 660) ; *Linski, supra.*

Nothing appears more certain than that this was a labor dispute. This was a disagreement between some employees of the Chrysler Corporation and their employer over job elimination and work stand-

ards. Lack of union sanction for the stoppage does not change the nature of the difficulty. The labor disputes disqualification should have been applied.

Circuit Judge Gilmore, whose opinion follows, dealt fully and accurately with all the issues presented by this appeal:

. "It appears that this case is controlled totally by *Linski* v. *Employment Security Commission,* 358 Mich 239. It is clear here, that the action of the workers taken for the purpose of protecting a change inaugurated by the company in the method of gauging and welding axle housings is a labor dispute. The term 'labor dispute' includes any controversy between employers and employees or their representatives concerning or affecting hours, wages, or working conditions. In the State labor mediation act (CL 1948, § 423.2, subd [b] [Stat Ann 1947 Cum Supp § 17.454(2), subd (b)]) it is defined as follows:

" 'The terms "dispute" and "labor dispute" shall include but are not restricted to any controversy between employers and employees or their representatives * * * concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining or changing terms or conditions of employment.'

"In the *Linski Case, supra,* the Court held that it is not the duty of the Court to inquire into the merits of a labor dispute in an unemployment compensation case. It held that where there was a labor dispute, the labor dispute section of the statute rather than the misconduct section applies, specifically overruling *Cassar* v. *Employment Security Commission,* 343 Mich 380, on this point.

"The Court feels *Linski* governs the facts in the instant case. There is no question but what the great weight of the evidence shows a stoppage of work because of a labor dispute in the employer's establishment. Consequently, the claim of the appellant must, in conformity with *Linski,* be adjudi-

cated under the labor dispute section rather than the misconduct section of the employment security act. As the Court said in *Linski,* pages 243, 245:

"'The referee on appeal very obviously came to the conclusion that the claimant was in violation of the contract in calling the strike without union authorization. On this record both the referee and appeal board were entitled to arrive at this conclusion. And the penalty of discharge provided by contract has been applied, is in effect, and is, of course, not a subject of this appeal. * * * And the record also shows that the contract penalty of discharge has been applied. We can find no warrant for adding to the contract penalty for breach still another penalty not squarely spelled out in the statute.'

"Clearly the labor dispute section of the statute applies and the appeal board was in error in applying the misconduct provision. The determination of the appeal board is reversed."

Affirmed. Costs to claimant.

TALBOT SMITH, KAVANAGH, and SOURIS, JJ., concurred with EDWARDS, J.

BLACK, J. (*concurring*). This case, like *Reed* v. *Employment Security Commission,* 364 Mich 395, was decided by the appeal board prior to handing down of *Linski* v. *Employment Security Commission,* 358 Mich 239 (overruling *Cassar* v. *Employment Security Commission,* 343 Mich 380). Unlike *Reed,* it was decided in circuit after the opinions of *Linski* were signed and filed. In this case the circuit judge, having *Linski* freshly before him, properly followed it.

The pure question of law presented in this case of Lillard is the same as that which we have simultaneously considered in *Reed.* I vote to affirm. See separate opinion of *Reed.*

DETHMERS, C. J., did not sit.