[No. 20599–4–I. Division One. August 15, 1988.]

KEVIN GIBSON, ET AL, *Appellants,* v. THE DEPARTMENT OF EMPLOYMENT SECURITY, *Respondent.*

*Finley Young* and *Davies, Roberts, Reid & Wacker,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Thomas L. Anderson, Assistant,* for respondent.

COLE, J.*—Kevin Gibson, Walter Henrickson, Dana Stoneburner, Leroy C. Scott, Patty Marie Livsey, and John W. Morgan appeal a judgment of the trial court affirming a decision of the Commissioner of the Washington State Employment Security Department (Department). The Commissioner held that the claimants were discharged for "misconduct connected with [their] work" and therefore, pursuant to RCW 50.20.060, were disqualified from receiving unemployment compensation benefits. We reverse.

## I
### FACTS

The six claimants were employed by Lockheed Shipbuilding & Construction Company in Seattle prior to their discharge on November 4, 1983, for failure to report to work.

Sometime in October 1983, Lockheed management became aware of a contract labor dispute between the Shipwrights Local 1184 and two subcontractors operating on Lockheed's premises. At 5:11 p.m. on Monday, October 31, 1983, a telegram was sent to the International Brotherhood of Boilermakers, Local 104, notifying them of the dispute and stating that due to an impending strike by the Shipwrights "subcontractor gates had been established" and that

---

*Judge W.R. Cole is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

[a]ll other persons are required to use the main gate. You are requested to encourage your membership to report for work at Lockheed Shipbuilding in accordance with the meaning and intentions of Article 22 of the agreement. Those failing to do so will be subject to discharge.

Although it would have been possible for Lockheed to provide leaflets to its employees regarding the possible strike, a procedure that had been utilized with regard to reporting on the status of contract negotiations, Lockheed did not use this leaflet process to advise its employees of the possibility of the subcontractor strike.

As they arrived for work on Wednesday morning of that week, November 2, 1983, the claimants observed pickets outside the main gate. Management representatives were inside the gate observing the activity. The signs being carried read "on strike," gave the Shipwrights' local number, and had a handwritten portion stating "neutral gate observer." The claimants did not know what "neutral gate observer" meant, and talked to the pickets. The pickets told the claimants that they were a sanctioned picket line. The claimants realized that the dispute was between another union and the subcontractors, but felt they had both a duty and a right to honor what they believed to be a sanctioned picket line.[1]

Some of the claimants spoke together outside the gate and at a restaurant across the street trying to decide the appropriate action to take in response to the pickets. They were confused and were unable to obtain definitive answers among themselves. They attempted to contact their union's business agent but were unable to do so. Each of them then called into Lockheed and informed the company that they would not be in that day because of the picket line. Several of them then proceeded to go to the union hall, but were

---

[1]The record contains statements by a union representative that it was customary for members to honor picket lines in the absence of any other information, and that the claimants' actions had not been in direct violation of the master labor agreement. The union representative also indicated that there was "no way we could advise any members of Lockheed's position re the Mailgram."

again unable to obtain any definitive advice, so they went home. None of them knew about Lockheed's telegram to the union.

That afternoon, at around 1:30, the president of the local, Dan Mahoney, who was among those who had refused to cross the line,[2] received a telegram from the union's headquarters in Kansas City directing the Boilermakers to report for work. Some of the claimants returned to work that afternoon and others reported for work the following morning.[3] Upon arriving at work the next morning, all of them were called to a conference and put on indefinite suspension for violating the Lockheed Shipbuilding Code of Employee Performance and Conduct as well as article 23.3 of the master labor agreement between the Boilermakers and Lockheed. Termination letters were issued on November 4, 1983.

The Employee Performance and Conduct Code reads in pertinent part as follows:

> Discharge will also result for major or flagrant violations of Company regulations. . . . Some typical examples of behavior which normally will result in employee discharge are listed below.
>
> . . .
>
> Actively creating, encouraging or participating in disorders, violence, work stoppages or any other activity with the intent to disrupt or interfere with the conduct of business by the company or the performance of working duties by company personnel.

Relevant sections from the master labor agreement read as follows:

> 22.1 (Strikes and Lockouts Barred) There shall be no lockouts on the part of the Company, nor suspension of work on the part of the employees. This Agreement is a guaranty that for its duration there will be neither strikes

---

[2]Mahoney was also fired for refusing to cross the picket line, but he is not a party to this action.

[3]All claimants were fired regardless of when they returned to work.

nor lockouts, and that all complaints, grievances, or disputes arising under its provisions will be settled pursuant to its grievance machinery, Article 23, "Grievances and Complaints" and Article 24, "Arbitration of Disputes."

23.3 (Grievances and Complaints) No employee shall refuse to work or otherwise curtail production or engage in any slow down or interfere with Company's operation because of any complaint, dispute, or grievance which he may have.

The claimants, including a former chief shop steward, claimed no knowledge of the company code of conduct.[4] A management representative testified that the company code was implemented in December of 1982, and was posted on bulletin boards throughout the company.

An administrative law judge heard the claims and held that benefits should be allowed. The company petitioned for review and the Commissioner of the Department reversed the administrative law judge. The Commissioner held that the claimants were discharged for misconduct connected with their work and were therefore not entitled to unemployment benefits, pursuant to RCW 50.20.060. The claimants appealed that decision to the Superior Court, which affirmed the Commissioner.

## II
### STANDARD OF REVIEW

Judicial review of decisions of the Commissioner of the Department of Employment Security is to be in accordance with RCW 34.04.130 of the administrative procedure act (APA). RCW 50.32.120. RCW 34.04.130(6) provides:

The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or

---

[4]However, one of the claimants, the former shop steward, did admit to familiarity with the master labor agreement's "no-strike" clause.

(c) made upon unlawful procedure; or
(d) affected by other error of law; or
(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
(f) arbitrary or capricious.

## A
### Fact Issues

The duty of the reviewing court is to search the entire record for facts both supportive of and contrary to the agency's findings. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456 (1951)). With regard to factual determinations, the APA's clearly erroneous standard of review governs. *Franklin Cy. Sheriff's Office,* 97 Wn.2d at 324. This clearly erroneous test replaced an earlier substantial evidence test, indicating the Legislature's intent to allow broader, more intensive review of an agency's factual determinations. *Ancheta v. Daly,* 77 Wn.2d 255, 259, 461 P.2d 531 (1969). A finding is "clearly erroneous"

> when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948) (cited with approval in *Ancheta* and *Franklin Cy. Sheriff's Office*).

## B
### Issues of Law

█ The "error of law" standard of RCW 34.04.130(6)(d) is the standard to be applied to issues of law. *Franklin Cy. Sheriff's Office,* 97 Wn.2d at 325. Under this standard, the reviewing court essentially substitutes its judgment for that of the administrative agency, since issues of law are the responsibility of the judicial branch to resolve. *Franklin Cy. Sheriff's Office,* 97 Wn.2d at 325. Deference is to be given,

however, to the expertise of the administrative agency. *Ancheta*, 77 Wn.2d at 260. For example, "the agency's construction of statutory words and phrases and legislative intent should be accorded substantial weight". *Overton v. Economic Assistance Auth.*, 96 Wn.2d 552, 555, 637 P.2d 652 (1981).

C

Mixed Questions of Law and Fact

Mixed questions of law and fact, that is, issues that involve the propriety of inferences drawn by an agency, or the process of comparing and applying the correct law and the correct facts to determine legal consequences shall be reviewed de novo. *Franklin Cy. Sheriff's Office*, 97 Wn.2d at 329–30. De novo review in such situations is again based on the inherent authority of this court to determine the correct law. *Franklin Cy. Sheriff's Office*, 97 Wn.2d at 330.

III

WORK–RELATED MISCONDUCT

The Legislature has declared that the unemployment compensation statute "shall be liberally construed for the purpose of reducing involuntary unemployment" and that funds are "to be used for the benefit of persons unemployed through no fault of their own". RCW 50.01.010; *Ciskie v. Department of Empl. Sec.*, 35 Wn. App. 72, 75, 664 P.2d 1318 (1983). This fault principle underlies a number of the statutory grounds for disqualification to receive benefits, including the misconduct disqualification set forth in RCW 50.20.060, which is at issue here. *Ancheta*, 77 Wn.2d at 261. That section provides that an individual "shall be disqualified from benefits beginning with the first day of the calendar week in which he or she had been discharged or suspended *for misconduct connected with his or her work*". (Italics ours.) RCW 50.20.060(1).

Our Supreme Court recently undertook a thorough review of the misconduct disqualification cases decided under RCW 50.20.060 in the face of conflicting analyses by the various divisions of the Court of Appeals. *See Macey v.*

218

*Department of Empl. Sec.,* 110 Wn.2d 308, 314–19, 752 P.2d 372 (1988).[5] The *Macey* court modified the standard previously adopted in Division One which derived from the oft–cited case of *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 296 N.W. 636 (1941), agreeing with Division Two that certain elements of the *Boynton* test were confusing and misleading. *Macey,* 110 Wn.2d at 317–18. The court set forth the following criteria for establishing disqualifying misconduct:

> (1) The rule must be reasonable under the circumstances of the employment; (2) the conduct of the employee must be connected with the work . . .; and (3) the conduct of the employee must in fact violate the rule. . . .[6]

*Macey,* 110 Wn.2d at 319.

 The *Macey* court elaborated on what constituted conduct "connected" with the work. The court stated that the emphasis should be upon the conduct of the employee rather than on consideration of the employer's interests as had been emphasized under the *Boynton* approach.[7] Thus, *Macey* held that intentional conduct violating a reasonable rule would constitute misconduct. Additionally, repeated but unexcused acts, even though they may be unintentional, may also constitute misconduct, especially if they occur after notice or warnings. *See Macey,* 110 Wn.2d at 318. The employer's interest is relevant only to the question of

> the effect of the employee's conduct upon his work performance in particular and upon the work force in general. For example, repeated unexcused tardiness or

---

[5]*Macey* was decided after the Commissioner's decision and the trial court's judgment were rendered in this case.

[6]The court used the term "rule" to refer to any order, rule or regulation of the employer. *Macey v. Department of Empl. Sec.,* 110 Wn.2d 308, 316, 752 P.2d 372 (1988).

[7]*Boynton* required a "willful or wanton disregard of an employer's interests", or "carelessness or negligence" of such a degree as to manifest similar culpability. *See Macey,* 110 Wn.2d at 317.

absences prevents the employee from performing his or her particular job, but may also impact adversely the performance of the work force in general. *Macey,* 110 Wn.2d at 319. The *Macey* court also held that "errors of judgment or ordinary negligence, at least in *isolated instances,*" do not constitute misconduct. *Macey,* 110 Wn.2d at 318 (citing *Boynton,* 296 N.W. at 640). Thus, *Macey* did not abandon those elements of *Boynton* that appear to be most relevant to this case.

The claimants contend that their conduct constituted, at most, an isolated incident of negligence or poor judgment, since they were genuinely confused by the situation they faced at the gate and since they made diligent efforts to clarify their obligations to Lockheed, returning promptly when they obtained that clarification. They also argue that they had inadequate notice of the company code and that in any case it does not represent a waiver of their right to engage in sympathy strikes. The Department replies that the code was properly promulgated and that the claimants' acts constituted misconduct in that they consciously chose not to perform their duties because of misguided views regarding their interpretations of their union agreement.

First, the cases relied on by the Department, *Durham v. Department of Empl. Sec.,* 31 Wn. App. 675, 644 P.2d 154 (1982) and *Willard v. Employment Sec. Dep't,* 10 Wn. App. 437, 517 P.2d 973 (1974), unlike the instant case, involve situations in which there were clear disputes between workers and management and knowing disobedience of direct orders. Second, as *Macey* indicates, errors of judgment in isolated circumstances will not be deemed misconduct under our statute, RCW 50.20.060(1).[8] Even assuming

---

[8]*Macey* cautions against relying upon cases from other jurisdictions which may have different standards of review or statutory language. *Macey,* 110 Wn.2d at 316–17. It is interesting to note, however, that the majority of cases cited by the parties from other jurisdictions have reached results favoring the claimants' position. *See, e.g., Lillard v. Michigan Empl. Sec. Comm'n,* 364 Mich. 401, 110 N.W.2d 910 (1961) (engaging in unauthorized walkout following labor dispute is not misconduct); *Linski v. Appeal Bd. of Mich. Empl. Sec. Comm'n,* 358 Mich.

that claimants knew or should have known of the terms of both the master labor agreement and the company code and erroneously interpreted them,[9] as the Department contends, their conduct occurred only once. It did not involve "repeated unexcused tardiness or absences". *Macey,* 110 Wn.2d at 319. Thus, the Commissioner's conclusion that their acts constituted "misconduct" as that term is used in RCW 50.20.060 is an error of law. We therefore reverse and hold that the claimants are entitled to unemployment benefits.[10]

## IV

### ATTORNEYS' FEES

The claimants seek attorneys' fees and costs on appeal. Under RCW 50.32.160, costs and a reasonable attorneys' fee for administrative or court proceedings are to be awarded

---

239, 99 N.W.2d 582 (1959) (encouraging work stoppage is not misconduct); *Penflex, Inc. v. Bryson,* 506 Pa. 274, 485 A.2d 359 (1984) (participation in work stoppage is not willful misconduct, particularly in the absence of contractual language warning employees that they could be terminated); *Frei v. Unemployment Comp. Bd. of Review,* 5 Pa. Commw. 190, 289 A.2d 769 (1972) (refusal to cross picket line not misconduct). Decisions favoring the employer's position from other jurisdictions appear to be distinguishable. *See, e.g., ITT Continental Baking Co. v. Davila,* 388 So. 2d 1254 (Fla. Dist. Ct. App. 1980) (*intentional* violation of specific "no–strike" clause *after three prior warnings* constituted misconduct); *Bogue Elec. Co. v. Board of Review of Div. of Empl. Sec. of Dep't of Labor & Indus.,* 21 N.J. 431, 122 A.2d 615 (1956) (work stoppage *that clearly constituted breach of labor contract* was misconduct).

[9]The question of whether claimants' interpretation of their labor agreement was indeed erroneous is a complex question of labor law which this court need not reach. Claimants cite some authority indicating that the presence of a "no–strike" clause in a collective bargaining agreement does not necessarily waive the rights of employees to engage in a sympathy strike. *See Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.), *cert. denied,* 423 U.S. 925, 46 L. Ed. 2d 252, 96 S. Ct. 269 (1975); *cf. Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 49 L. Ed. 2d 1022, 96 S. Ct. 3141 (1976) (district court may not enjoin sympathy strike pending arbitrator's decision as to whether strike violated no–strike clause).

[10]In view of our holding, we need not reach the other issue raised by the claimants, that Lockheed's rule was not "reasonable" under the *Macey* test since it was not effectively communicated to the employees.

to a claimant in the event that the decision of the Commissioner shall be reversed or modified. *Ancheta,* 77 Wn.2d at 265–66. The fee and costs "shall be payable out of the unemployment compensation administration fund." RCW 50.32.160. The amount is to be fixed by the Court of Appeals in the event of an appeal to this court.

Mr. Young has complied with the provisions of RAP 18.1 regarding the recovery of attorneys' fees. We therefore award claimants their costs and $8,990 in fees.

Mr. Young's affidavit references services provided by prior counsel, and requests "such additional amounts to prior counsel as the court may deem reasonable." Without affidavits from prior counsel, it is impossible for this court to fix a reasonable amount. We therefore remand to the Superior Court to determine fees of prior counsel. *See Scully v. Department of Empl. Sec.,* 42 Wn. App. 596, 605–07, 712 P.2d 870 (1986).

SWANSON and PEKELIS, JJ., concur.